2016 IL App (3d) 140958

Opinion filed March 29, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Rock Island County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-14-0958 |
| | ) | Circuit No. 14 CF 84 |
| AL CARTER, JR., | ) | |
| | ) | The Honorable |
| Defendant-Appellee. | ) | Michael F. Meersman, |
| | ) | Judge, Presiding. |

JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices Carter and Schmidt concurred in the judgment and opinion.

**OPINION**

¶ 1     On January 31, 2014, after the execution of a search warrant, defendant, Al Carter, Jr.,

was charged by information with possession of a firearm (720 ILCS 5/24-3.8(a) (West 2012)),

unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2012)), and three

counts of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2012)). On March 31,

2014, defendant moved to quash the warrant and suppress the physical evidence, a gun, allegedly

found after the search authorized by the search warrant had concluded. Defendant argued that the

search warrant issued without probable cause and that the search of the location where the gun

was found was beyond the scope of the search warrant. The trial court granted the defendant's motion, holding that although the search warrant was executed in good faith the subsequent unwarranted search and seizure of the gun did not meet the requirements of inevitable discovery as argued by the State. The trial court denied the State's motion to reconsider finding that the subsequent search resulting in the discovery of the gun was not within the scope of the search warrant. The State appeals, arguing that the trial court erred in determining that the police would not have inevitably discovered the gun. For the following reasons, we affirm.

¶ 2                                                    FACTS

¶ 3        On January 31, 2014, Officer Paul Girskis of the Rock Island Police Department presented a complaint for a search warrant for 1816 and 1816 ½ 11th St. in Rock Island, a duplex, owned and co-inhabited by defendant. The complaint alleged that defendant and Jeffery T. Tyler, who also resided at the duplex, unlawfully possessed cannabis and/or a controlled substance and various other drug dealing related paraphernalia. The complaint included an affidavit completed by Girskis who averred (1) that an informant told him controlled substances had been sold from the residence, (2) that according to the police database both Tyler and defendant have extensive criminal histories, and (3) that there had been a controlled buy executed between the police department and Tyler where defendant transported Tyler to the buy location and then back to the residence. A warrant was issued to search the entirety of the duplex.

¶ 4        The following facts regarding the layout of the house and testimony concerning the execution of the search warrant were adduced at the suppression hearing.

¶ 5        The defendant lived on the main floor of the two-story duplex and Tyler lived on the second floor. The only way to enter the second floor apartment was by going up a flight of

exterior stairs, and one would need a key or permission from the tenant to enter the space. There was no interior entrance to the second floor apartment from the main floor. The house also had a basement where a third individual, Richard Murray, lived. The basement unit was accessible through the rear exterior door on the main floor and by stairs going down. There was no second door at the top of the stairs to control access to the lower unit. Also inside the rear exterior door was an entrance to the main floor through a door leading into the kitchen. That door could be locked to block access from the rear door and from the basement.

¶ 6                              Defendant's Testimony

¶ 7        On January 31, 2014, the police executed the search warrant. Defendant testified that the police climbed the exterior stairs and broke through the door to Tyler's upstairs apartment. At the same time, officers entered his main floor apartment. He was uncertain whether Murray had opened the rear door for the officers. He stated that upon entering, the officers immediately secured defendant, his girlfriend, his daughter, and Murray by handcuffing them and directing them to sit on the couch. The officers then searched every room of the house. Defendant testified that the search of the main floor yielded a pipe from the couch and a "bud" in a chair.

¶ 8        During a search of the bedroom in Murray's apartment, defendant stated that the police found crack cocaine and a "Chore Boy" on top of a table, a digital scale on top of a heater, and a glass crack pipe underneath the water heater. While Murray was being ushered out of the house after being handcuffed and arrested for possession of those items, defendant testified that Murray told the arresting officer that the house and the items in it belonged to defendant. An officer responded to Murray that he was being arrested because the drugs and contraband were found in his living space. Defendant testified that Murray also exclaimed he wanted to talk with the officers. The police continued ushering Murray out of the door. Defendant testified that the

3

police released him and his girlfriend from their handcuffs, told him he needed to repair the broken door to the upstairs apartment, and left the premises. He stated that when he looked out of his rear kitchen window into his backyard and the alley, he did not see any officers or any police lights. He conceded that the view was a bit obstructed by the garage.

¶ 9    About 15 minutes later, defendant stated he heard a knock at the back door. His girlfriend answered it. The police entered, walked directly into the dining room, and an officer stated he needed to check one more thing. Without waiting for defendant's acquiescence, an officer went directly to the couch, flipped it, and heard a noise when setting it back down. The officer cut out the bottom fabric of the couch and discovered a gun. Defendant was then handcuffed and taken to jail.

¶ 10                              Police Testimony

¶ 11    The State called Girskis, who testified that he was involved in the execution of the search warrant on defendant's property. He stated that pursuant to the search, Murray was arrested and taken outside. Once outside, Murray told him there was a gun in the house located in the couch. Girskis stated that he immediately called to Sergeant Shawn Slavish who was also present at the scene but still inside the residence. He told Slavish that Murray had information he needed to share with them. Slavish then came outside the house and spoke with Murray, who said that a weapon could be found inside the couch in the house. Girskis testified the entire exchange lasted only a few minutes. He stated that Slavish then reentered the house and found the gun in the location identified by Murray.

¶ 12    Slavish's testimony echoed Girskis' statement of events during the execution of the search warrant and defendant's arrest. He further noted that he was unsure why, but the couch had not been searched during the initial execution of the warrant. When asked by the court, Slavish

4

stated that at the time he went outside to talk with Murray, the police were still on defendant's property, but no officer was in the house.

¶ 13     At the conclusion of the suppression hearing, the court requested and received briefing from the defendant on whether the affidavit was sufficient to justify the issuance of the search warrant and to authorize both the initial search for the contraband identified in the warrant and the subsequent search for the gun.

¶ 14     The trial court granted defendant's motion to quash his arrest and suppress the evidence. The court found that the affidavit for the search warrant was "barebones," but sufficient. The court further discussed the execution of the search warrant and considered whether the search of Murray's living space was proper as it was the sole reason the police were ultimately led to the gun. The court determined that although the search warrant for the drugs and other contraband was supported by probable cause, the seizure of the gun was not an inevitable result. The gun was in fact not found prior to the completion of the warranted search of defendant's apartment. Nor would it have been found after the completion of the valid search if Murray had not been arrested following the non-warranted search of his apartment that led to his disclosure of the gun's whereabouts to the police.

¶ 15     The State filed a motion to reconsider the decision to quash his arrest and suppress evidence. It argued that all prior arguments should be reconsidered; that the house was a duplex, not a triplex; that officers had a reasonable belief it was a duplex; that the defendant lacked standing to assert Murray's privacy rights; and that Murray lacked any reasonable expectation of privacy. The State wanted to introduce additional evidence showing Murray lived with his girlfriend and only stayed at defendant's house when he and his girlfriend were fighting; that police watched the house and never saw Murray; and that police observed defendant and Tyler

5

leave the "house in question" and drive to the controlled buy location. Defense counsel filed a response and moved to bar any additional evidence arguing that a party may not raise a new legal argument in a motion to reconsider. The State did not reply.

¶ 16　　　At the hearing on the motion to reconsider, the court, taking everything in the State's motion as true, denied it. It reiterated that, although it had determined and re-affirmed the validity of the original search warrant, a question remained regarding the re-entry and seizure of the gun after the original search concluded. The court expressed concern regarding the police re-entry for the purpose of searching for something that was not listed in the affidavit or search warrant and was not discovered in the original search. It ultimately found that although the police were still on the property, the search was over when the last officers walked out of the door.

¶ 17　　　The State timely appealed.

¶ 18　　　　　　　　　　　　　　ANALYSIS

¶ 19　　　Here on appeal, the State argues that the trial court erred in granting defendant's motion to quash his arrest and suppress evidence. It asserts that questions about the propriety of the search of Murray's living space pursuant to the search warrant, the discovery of contraband there, and the use of volunteered information from Murray about the evidence in question cannot be sufficient grounds to suppress the evidence because defendant did not have a reasonable expectation of privacy in Murray's living space and the gun was obtained in accordance with the doctrine of inevitable discovery. In the alternative, the State asserts that the state of the record is insufficient for a reasoned judgment on the merits of the inevitable discovery issue and requests remand for an evidentiary hearing.

6

¶ 20        Defendant counters that the motion was properly granted. He argues that the execution of the search warrant had concluded and the officers made an illegal reentry and conducted an illegal search for an item not specified in the search warrant. They did this based on the statement of another person who had just been arrested for possessing drugs and who was attempting to pass blame on defendant. He further claims that, in the alternative, his motion was properly granted because a substantial basis to conclude that probable cause existed to issue the search warrant was not provided.

¶ 21        While great deference is given to the factual findings made by the trial court and they will be reversed only if contrary to the manifest weight of the evidence, a trial court's legal ruling on whether evidence should be suppressed is reviewed *de novo*. *People v. Luedemann*, 222 Ill. 2d 530, 542-43 (2006).

¶ 22        As an initial matter, we find that the trial court did not err in its factual finding that the search warrant was valid. In determining whether a warrant was validly issued, a reviewing court does not substitute its judgment for that of the issuing magistrate but decides merely whether there was a substantial basis for the finding that probable cause existed for the warrant's issuance. *People v. McCarty*, 223 Ill. 2d 109, 153 (2006). "[T]he existence of probable cause in a particular case means simply that the totality of the facts and circumstances within the affiant's knowledge at that time 'was sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched.' " *Id.* (quoting *People v. Griffin,* 178 Ill. 2d 65, 77 (1997)).

¶ 23        In the trial court's initial ruling on the matter, it found that the search warrant for defendant's house was "barebones" but still "passe[d] muster," noting only that there was nothing really tying defendant to the agent drug buy other than his being the driver. Later in ruling on the

7

State's motion to reconsider, the court held that its previous finding regarding the warrant was erroneous. The judge clarified that it missed the averment in the affidavit that the controlled buy "that had occurred had been followed from [defendant's house] to *** the place of the transaction." Thus the court found the warrant was more than "barebones" and reaffirmed that it was validly issued. We agree. This information as well as the other information provided in the complaint and accompanying affidavit for the search warrant provided a substantial basis for finding probable cause to issue the warrant.

¶ 24    Armed with the valid warrant, the police searched all three units in the "duplex," finding in defendant's unit only a pipe in a couch and a "bud" in a chair. The State concedes in this appeal that the second search that lead to the seizure of the gun was made after the original search had concluded and was, therefore, illegal. The State contends, however, that the gun can still be used to support the charges against the defendant because its discovery was "inevitable."

¶ 25    The fourth amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; see also *Elkins v. United States*, 364 U.S. 206, 213 (1960) (observing that fourth amendment applies to state officials through fourteenth amendment (U.S. Const., amend. XIV)). If probable cause exists, it is reasonable for a valid search warrant to be issued for the search of the particular place and seizure of the particular person or things described in the warrant. *McDonald v. United States*, 335 U.S. 451, 455 (1948); 725 ILCS 5/108-7 (West 2014). Execution of a search pursuant to a warrant must also be reasonable. See *People v. Fant*, 66 Ill. App. 3d 991, 993 (1978); see also 725 ILCS 5/108-8(a) (West 2014).

¶ 26    In this case, testimony shows that at the time Murray shared the information about the gun to Slavish, all of the police had exited the house and the execution of the search warrant had

8

been completed. Defendant testified without contradiction that he and his girlfriend had been unhandcuffed, he had been told he needed to repair the broken second floor apartment door, and all of the officers had left the house. Thus the trial court's finding that the officers were no longer in the house but at the most outside on the lawn and that execution of the search warrant had concluded was proper.

¶ 27     As previously noted, the State concedes the correctness of this finding and agrees that at this point, the reentry and search of the couch constituted a second search that could not relate back to the already executed search warrant. See *State v. Trujillo*, 624 P. 2d 44, 48 (N.M. 1981) (noting a cross jurisdictional unanimous rule "that a warrant is executed when a search is conducted, and its legal validity expires upon execution," so that "[a]fter execution, no additional search can be undertaken on the same warrant"). Reentry would therefore require some other legally sound justification. The State argues such justification is found in the doctrine of inevitable discovery.

¶ 28     It was unclear from the briefs precisely what the State's argument was with respect to the second search of defendant's home. However, during its oral argument the State made clear that its argument was that the gun would have been found pursuant to the inevitable discovery doctrine because a second search warrant could have been obtained.

¶ 29     For application of the doctrine, the State must "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Lawful means in this instance means that the police would have had to either (1) gain non-coered permission from defendant or someone else with authority to grant such permission to enter and search the identified area (*Georgia v. Randolph*, 547 U.S. 103, 106 (2006)), (2) identify an exigent circumstance allowing for

9

warrantless reentry (*People v. Wimbley*, 314 Ill. App. 3d 18, 24-25 (2000)), or (3) acquire another search warrant (*McDonald*, 335 U.S. at 455). Because the trial court took as true all of the facts proffered by the State in its motion for reconsideration, no additional evidentiary hearing was necessary. We find, on the basis of the facts before us, that none of the aforementioned lawful means occurred.

¶ 30    The record shows that the officers came back to the house, knocked on defendant's door, stated they needed to search one more thing, and proceeded to search the couch. Nothing in the record evinces defendant or anyone else in the house granting permission for the second search. Thus permission or consent to search the home was not legally acquired.

¶ 31    The Supreme Court in *Payton* recognized the long-settled principle that, absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within. *Payton v. New York,* 445 U.S. 573, 587-88 (1980). In identifying what constitutes exigent circumstances rendering a warrantless entry of a suspect's home reasonable, our supreme court in *Abney* listed numerous factors to be considered.  The *Abney* factors include: (1) the need for prompt action; (2) the absence of any deliberate or unjustified delay by the officers during which time a warrant could have been obtained; (3) the belief that a suspect was armed and exhibited some sign of a violent character; (4) the officers were acting on a clear showing of probable cause based on reasonably trustworthy information; (5) the defendant was clearly identified as the perpetrator; (6) the officers had a strong reason to believe that the defendant was in the premises entered; and (7) the entry was peaceful.  *People v. Wimbley*, 314 Ill. App. 3d 18, 25 (2000) (citing *People v. Abney,* 81 Ill. 2d 159, 169-72 (1980)). Three years later in *Yates*, our supreme court listed additional factors to consider. *People v.*

10

*Yates,* 98 Ill. 2d 502, 515 (1983). These factors include: (1) a grave offense is involved, particularly one of violence; (2) a likelihood exists that the suspect will escape if not swiftly apprehended; and (3) the time of arrest is a reasonable time of the day. *Id.* The *Yates* court stressed that these factors are merely guidelines and should not be viewed as "cardinal maxims to be rigidly applied in each case." *Id.* at 515-16. Nevertheless, it continued to note that the "guiding principle" in determining whether exigent circumstances exist is "reasonableness" and each case must be decided based upon its own facts. *Id.* at 515; *Abney,* 81 Ill. 2d at 173.

¶ 32　　　　After considering the facts of this case and the *Abney /Yates* factors, we do not believe exigent circumstances existed. Though defendant, a felon, was allegedly illegally in possession of a gun, there was no immediate threat of harm or injury to the officers or anyone else because of the possible presence of the gun in the house. There was also no reason for them to believe defendant would attempt to flee or dispose of the evidence. They had just completed what defendant implies was an intrusive and destructive search of his home for drug contraband pursuant to the valid warrant; and Murray did not tell them about the gun in the defendant's presence. Though Slavish states that they did not search the couch as typically required, the record shows that a couch was searched and yielded a pipe. Therefore, there was nothing to suggest to defendant that the police would come back and look for the gun in the purportedly unsearched couch. Thus there were no exigent circumstances requiring the need for swift action or a justification for not seeking a new warrant.

¶ 33　　　　The State's actual assertion that discovery of the gun was inevitable because the police were capable of acquiring a second warrant is not persuasive and also flies in the face of the purpose of obtaining a warrant. Specifically, the Sixth Circuit of the Federal Court of Appeals in *Griffin* found that:

11

"[A]bsent any of the narrowly limited exceptions [citation] to the search warrant requirement, police who believe they have probable cause to search cannot enter a home without a warrant merely because they plan subsequently to get one. The assertion by police (after an illegal entry and after finding evidence of crime) that the discovery was 'inevitable' because they planned to get a search warrant and had sent an officer on such a mission, would as a practical matter be beyond judicial review. Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment." *United States v. Griffin*, 502 F.2d 959, 961 (6th Cir. 1974).

¶ 34    In this case, the police did not even attempt to get a second warrant but instead took it upon themselves to decide that their "probable cause" – a statement from Murray that a gun was in the couch – was sufficient to reenter the house and search the couch. Moreover, they ignored the fact that the house was inhabited not only by defendant, but also several other individuals, any one of whom could have legally owned the gun.[1]

¶ 35    Further, the State's assumption that a warrant *could* have been obtained is not fully supported by the record. In *Halmon*, the court rejected the State's argument that co-defendant's statement implicating defendant while denying self involvement was sufficient for probable cause to arrest defendant because it was not buttressed by corroborating evidence. *People v. Halmon*, 225 Ill. App. 3d 259, 272 (1992) (citing *People v. James*, 118 Ill. 2d 214 (1987)). Here, the State's source for the information about the gun was Murray, a man who the trial court noted

---

[1] The trial court notes in its findings at the suppression hearing that though no other inhabitant in the house claimed legal ownership of the gun, it was not an inherently illegal item to possess and the police did not know at the time whether other persons in the house might be the legal owner.

12

"[was] scared to death he [was] going to jail, so he roll[ed] over on [defendant]." Murray's statement is further weakened by the fact that the police had just executed a search warrant of the house. Though Slavish stated that standard protocol was not followed and the couch was not searched during the execution of the initial search warrant, the evidence shows that a couch in defendant's living space was searched and it yielded a pipe. During defendant's testimony, he referred to it as "the couch." Thus even if adequate protection of defendant's fourth amendment rights could be sustained based on the fact the police *could* have obtained a second search warrant, confidence in its issuance is thin.

¶ 36 In summary, the State concedes the search of the duplex pursuant to the search warrant was completed without discovery of the gun; the State concedes a new search warrant was required to search further for the gun; and the State concedes no new search warrant was either sought or issued. Despite these concessions, the State contends the doctrine of inevitable discovery authorizes seizure of the gun and its use as the basis of the only crime with which defendant was charged. Because we find no fourth amendment support for the State's invocation of the doctrine of inevitable discovery, we find the trial court properly granted defendant's motion to squash his arrest and suppress the evidence of the gun.

¶ 37        CONCLUSION

¶ 38 The judgment of the circuit court of Rock Island County is affirmed.

¶ 39 Affirmed.