**2024 IL 129208**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 129208)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
CORTEZ TURNER, Appellant.

*Opinion filed September 19, 2024.*

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Holder White, Cunningham, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a bench trial in the circuit court of Jackson County, defendant Cortez Turner was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(1)), conspiracy to commit aggravated discharge of a firearm (*id.* §§ 8-2, 24-1.2(a)(1)), and two counts of perjury (*id.* § 32-2(a)). Defendant appealed, and the Appellate Court, Fifth District,

vacated his conspiracy conviction and one of his perjury convictions but otherwise affirmed the circuit court's judgment. 2022 IL App (5th) 190329. Defendant filed a petition for leave to appeal, arguing that the appellate court erred in upholding the trial court's denial of his motion to suppress items of his clothing that the police took from his trauma room in a hospital emergency department. According to defendant, he had a reasonable expectation of privacy in the trauma room, and therefore the police were required to obtain a warrant before entering the room. We allowed defendant's petition for leave to appeal, and we now affirm the appellate court's judgment.

¶ 2                                          BACKGROUND

¶ 3        On October 24, 2016, a shooting occurred in Murphysboro, Illinois, resulting in the death of Detrick Rogers. Defendant sustained a gunshot wound during the incident. In front of the grand jury, defendant denied knowing how he was shot. After evidence came to light implicating defendant in the shooting of Rogers, the State charged him with two counts of perjury. The State eventually charged defendant with several other offenses arising out of the incident, including first degree murder.

¶ 4        Defendant filed a motion to suppress evidence, arguing that the police violated his rights under the fourth amendment (U.S. Const., amend. IV) and the search and seizure clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) when they seized his clothing while he was being treated in a trauma room in the emergency department of St. Joseph Memorial Hospital. Defendant argued that the police did not have a warrant, the clothing was not in plain view, and defendant did not consent to its seizure. Defense counsel was subsequently allowed to withdraw from the case, and the court appointed new counsel. Defendant's new attorney filed another motion to suppress the clothing. This motion generally repeated the arguments from the first motion but also argued that the clothing was not seized incident to an arrest.

¶ 5        At the hearing on the motion to suppress, defendant presented the testimony of three witnesses. Janet Womick testified that she is a registered nurse and that she was working at the emergency department of St. Joseph Memorial Hospital on October 24, 2016. She treated defendant, whom she said was a "gunshot victim that

walked in the door." Womick testified that a patient who walks in with a trauma is taken to a room and triaged immediately.

¶ 6        Womick was asked to review the chart she prepared that evening. After reviewing the chart, Womick testified that defendant began receiving treatment at 1:44 a.m. Defendant's triage would have involved removing his clothing, doing a visual assessment, and multiple other tasks. The chart showed that he was administered morphine at 3 a.m. and again at 3:30 a.m.

¶ 7        The chart contained two paragraphs about detectives arriving and requesting to see the patient's clothing. Womick remembered that defendant's clothing was on the counter. Some of defendant's clothing had blood on it. The bloody items, which Womick believed were defendant's underpants and sweatpants, were in a plastic bag. Womick said that the blood on the clothes was visible through the bag. Defendant's shirt was out on the counter; Womick did not remember the shirt being bloody. Womick remembered defendant's shoes being at the foot of the bed.

¶ 8        Womick described the trauma room as "very small." She said that it measures 8 feet by 10 feet. Womick testified that everything in the room was visible from the door.

¶ 9        Womick remembered that two police officers entered the room and told defendant that they were going to need his stuff. Defendant was very cooperative with the police. Womick testified that her documentation showed that defendant specifically agreed that the officers could take his clothes.

¶ 10       On cross-examination, Womick explained that, prior to defendant's arrival in the emergency department, she had been expecting a gunshot victim via ambulance. The hospital had received a call that a gunshot victim would be arriving by ambulance in approximately four to six minutes. Defendant walked in the door while Womick was waiting to meet the ambulance. The ambulance with the other victim arrived approximately two minutes later. Womick explained that, when a patient arrives at the emergency room, she will talk to the patient to figure out what is going on and what level of treatment is necessary. When defendant arrived, he told her that he had been shot. He explained that he had been outside with a friend trying to get someone to pick him up. He borrowed someone's phone, and then he

heard some shots, and he dropped to the ground. When he got up, he realized that he was bleeding from the leg.

¶ 11        Womick testified that, when a gunshot victim comes to the hospital, the hospital is required to notify the police. In this case, the police were not contacted because the hospital had been notified that they were already on their way. Womick testified that she removed defendant's clothing because he was a trauma victim and she had to make sure the wound in his leg was the only injury. She placed all of the clothing on the counter but placed the bloody items inside a plastic bag. The counter on which she placed the clothing abutted the door, so a person who walks into the room would have been right next to the clothing and could easily see it.

¶ 12        Womick's notes showed that two police officers arrived on the scene and spoke with defendant at 2 a.m. Womick said that the officers asked defendant if they could see his clothing, and he agreed. Womick explained that the officers would already have seen defendant's clothing because it was in plain sight, but they nevertheless asked to see it. Womick's notes reflected that the officers told defendant that they were taking his clothing and that he shook his head in agreement. Womick was certain that the police requested the clothing from defendant and not from her. Womick recalled defendant being very cooperative with the police. Womick's notes showed that the clothing was bagged and taken by the police at 3:15 a.m. Defendant's mother was also in the room at this time. Womick did not hear anyone voice an objection to the police taking defendant's clothes. The police did not exhibit any pressure or intimidation, and their conversation with defendant was cordial. Womick further explained that defendant was not given morphine until after he consented to the police taking his clothes. Defendant did not have any difficulty communicating and did not appear to be confused, although he described the pain in his leg as a 9 out of 10.

¶ 13        On redirect examination, Womick reiterated that defendant had not yet been given morphine when he consented to the police taking his clothes.

¶ 14        Chris Liggett testified that he is a detective with the Jackson County Sheriff's Office. On October 24, 2016, another officer called and woke him up to tell him about a shooting incident and to ask him to go to the hospital in Murphysboro. When Liggett arrived at St. Joseph Memorial Hospital, he met with a number of police officers who were investigating the shooting. Liggett testified that Detective

Corey Etherton from the Murphysboro Police Department was already speaking with defendant when Liggett arrived at defendant's room in the emergency room. In addition to Etherton being present, Liggett recalled a nurse going in and out of the room. He remembered that she told him to get out of her way on one occasion.

¶ 15        Liggett testified that he and Etherton asked defendant questions about how he got shot and what circumstances of the shooting he could remember. Liggett said that defendant told them where his clothing was. He could see that there was blood on the items of clothing that were in the bag. The detectives asked if they could look at his clothes, and defendant said "yes." He also gave them permission to take the clothes. The only issue defendant had with the detectives taking his clothes was that he was concerned with how quickly he could get his shoes back because someone in his family had bought them for him. Liggett did not recall defendant's mother being in the room at this time. Liggett testified that defendant was lucid during the conversation and that he was not aware that defendant had been administered morphine.

¶ 16        Liggett testified that he did not write a report that evening but Etherton did. Liggett believed that the report would show that the detectives asked defendant permission to take his clothes. After being shown the report, however, Liggett acknowledged that the report did not mention defendant consenting to the detectives taking his clothes.

¶ 17        On cross-examination, Liggett reiterated that he specifically remembered asking defendant if the clothes on the counter were his. Defendant replied, "yes, they are." He was also certain that either he or Detective Etherton asked if they could look at the clothes and if they could take them. Defendant responded affirmatively to both.

¶ 18        Liggett further explained that the investigation began when an individual named Detrick Rogers was shot in the head and killed. Tangential to that, Liggett and other officers were summoned to St. Joseph Memorial Hospital for the report of another person who had been shot. Liggett testified that they ended up speaking to defendant at the hospital, and he identified defendant in court as the person he spoke to. Liggett testified that defendant told them that he was outside a friend's house trying to use a telephone to get on Facebook, heard some shots, and then discovered that he had been shot. He made his way to Jaycee Marble's house to try to get help.

Marble eventually took defendant to the hospital. Defendant told the detectives that he was a victim of the shooting but that he did not know who shot him.

¶ 19        Liggett was asked to describe the patient rooms in the emergency room. He said that there were three or four rooms and that they were tiny. Liggett described the rooms as half the size of a jail cell. He said that the rooms contained a bed, medical equipment, and a counter with a sink in it. He said that the counter was right up against the door and was roughly three feet away from the bed. As soon as a person walked into the room, any items on the countertop were immediately visible. When Liggett walked in, he remembered seeing a clear plastic bag with pants in it. The shirt and shoes were not in the bag. The pants looked like cargo pants with a camouflage pattern. Liggett observed what looked like blood on the pants. Liggett testified that defendant appeared to have no difficulty following the conversation, was not confused, and could communicate effectively. Defendant did not indicate any inability to understand the questions being put to him. He was clear when he told the police that they could look at his clothes. Liggett testified that defendant appeared to be in some pain but that it did not inhibit his ability to communicate effectively. Liggett said that the officers were at all times cordial with defendant and that they did not use any coercive tactics.

¶ 20        Liggett testified that he has investigated numerous shootings and that it is common when dealing with gunshot victims to obtain their clothes as a potential source of evidence. Clothes can be analyzed for both DNA and gunshot residue, and the police can also look at the tear patterns in the clothes. Although Liggett did not observe blood on the shirt or shoes, they were still potential sources of evidence, such as DNA and gunshot residue.

¶ 21        On redirect examination, Liggett acknowledged that he did not specifically remember whether it was him or Etherton who asked defendant's permission to take the clothes. He explained that the whole encounter was a conversation between himself, Etherton, and defendant and that it was hard to remember who asked which questions. He reiterated, however, that defendant was cooperative. Liggett also said that he always tries to get clothing from gunshot victims.

¶ 22        Defendant's final witness was his mother, Patrice Turner. Patrice testified that she learned from defendant's aunt that defendant had been shot. Patrice went to St. Joseph Memorial Hospital around 12 or 12:30 a.m. She was not allowed to see her

son when she first arrived but was told that she would have to wait in the waiting room. She was there for at least an hour before being taken back. When she was in defendant's room, the only other people present were defendant and a nurse. There were no police officers in the room, but she did see some leaving the emergency room when she arrived. She did not observe defendant's clothes in the room and did not hear anyone ask to take them.

¶ 23 Detective Etherton testified on behalf of the State. Etherton testified that he is a detective for the City of Murphysboro. He has worked for the Murphysboro Police Department since 2005. On October 24, 2016, at approximately 1:45 a.m., he was called into work because of a shooting that occurred in front of 1936 Shomaker Drive. Etherton had been told that there were two gunshot victims, later identified as defendant and Detrick Rogers. He went to St. Joseph Memorial Hospital to interview defendant. He spoke to him in a treatment room in the emergency department. Defendant told him that he had been outside the Shomaker Drive area, walking around using a phone. He said that he was using Facebook to try to find a ride. He heard some shots and believed that he had been shot. After the shots stopped, he went to his friend, Jaycee, to get a ride to the hospital.

¶ 24 Etherton explained that, to get to the room where defendant was being treated, a person would come in through the doors that the ambulances use and turn right into the main emergency department. The main emergency desk is located there. Defendant was in the second or third room on the left beyond the main desk. Etherton explained that the room contained a bed, a counter with a sink, and lots of medical equipment. Etherton had observed clothing items on the countertop. Etherton identified a picture of defendant in the treatment room at St. Joseph.

¶ 25 Etherton testified that defendant was not wearing any clothing in the trauma room but was covered with a blanket. Etherton determined that defendant had been shot in the left thigh area, near his groin. Etherton identified a photograph of defendant's gunshot wound as it appeared during his interaction with him.

¶ 26 Etherton said that he observed defendant's clothing on the countertop when he entered the room. He noticed a shirt, a pair of shoes, and a pair of pants. The pants were in a clear, plastic bag. Etherton described them as camouflage cargo-style pants, and he noticed that they appeared to be stained with blood. He confirmed that the clothing was visible as soon as one entered the room.

¶ 27 Etherton testified that defendant appeared to be in pain but that it did not hamper his ability to communicate. Defendant appeared to understand the questions that were put to him, and he gave appropriate responses to Etherton's questions. Defendant was cooperative with Etherton, and he was reporting that he was the victim of the shooting. However, he did not know who shot him. At some point, Detective Chris Liggett also arrived in the trauma room. Liggett, Etherton, and defendant had what Etherton described to be a fluid conversation between the three of them.

¶ 28 Etherton testified that various nurses and doctors were in and out of the room during the time that Etherton and Liggett were there. Etherton would try to stay out of the way of medical personnel because they would get a little angry with the detectives if they got in their way. Etherton asked defendant if the clothing on the counter was what he was wearing when he was shot, and defendant said that it was. Defendant gave the detectives permission to look at the clothes. Detective Liggett asked defendant if they could take the clothes as evidence, and defendant said "yes." Defendant's only concern was when he would get his shoes back, but this did not rise to the level of defendant saying they could not take the shoes. He was just curious when he would get them back. Defendant never voiced an objection to the detectives taking the clothes. Etherton testified that it is common to collect the clothing of gunshot victims, as the clothing can be a valuable source of evidence. Clothing can be a source of both DNA and gunshot residue.

¶ 29 On cross-examination, Etherton reiterated that Liggett was the one who asked defendant if the detectives could take his clothes. Etherton was "100% certain" that defendant responded "yes" to that question. Etherton again explained that defendant's pants were visible in the plastic bag as soon as one walked into his room and that what appeared to be blood was visible on the pants. Etherton said that the bloodstain might have been about five or six inches in diameter but that he could not remember for sure. Etherton reiterated that several medical personnel were in and out of the room while the detectives were there. He did not recall seeing defendant's mother in the room. Etherton said that he spoke to defendant's mother after defendant was transferred to another hospital.

¶ 30 Defense counsel argued that the evidence was insufficient to establish that defendant consented to the detectives taking the clothing. Counsel pointed out that

the nurse did not remember specifics and had to refer to a chart that she had written months ago. Counsel further noted that defendant had been given morphine and that the detectives had not written in their report that they had asked defendant's consent. Counsel also argued that the plain view exception was inapplicable because all that could be seen was an alleged stain on dark green cargo pants. Counsel emphasized that, at the time, defendant was a gunshot victim and not a suspect.

¶ 31 The State acknowledged that the police did not have a warrant to seize defendant's clothes. However, it argued that no warrant was necessary both because the clothes were in plain view and defendant consented to the detectives taking them. With respect to the clothes being in plain view, the State argued that their incriminating nature was clearly apparent because they were bloodstained and defendant was claiming to be a gunshot victim. The State further argued that defendant had no expectation of privacy in the trauma room because section 3.2 of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2016)) requires medical personnel to alert the police when they are treating someone who has sustained an injury resulting from a firearm. The State also argued that the testimony was clear that defendant had consented to the detectives taking his clothes, that morphine had not yet been administered when he gave consent, and that he was able to communicate effectively.

¶ 32 The trial court entered a written order denying the motion to suppress. The court found both that defendant's clothes were in plain view and that defendant consented to the detectives taking them. The court also found that the testimony established that, although defendant had been administered pain medication, he did not appear to have been unable to give knowing and voluntary consent at the time the detectives entered the room.

¶ 33 Following a bench trial, defendant was convicted of two counts of first degree murder, aggravated discharge of a firearm, conspiracy to commit aggravated discharge of a firearm, and two counts of perjury. Defendant filed a motion for a new trial, arguing that the court erred in denying his motion to suppress. For the first time, defendant argued that he had a reasonable expectation of privacy in the trauma room where he was treated and therefore the police violated his fourth amendment rights by entering the room without a warrant. The defendant further

argued that the plain view exception did not apply, as the police did not have a right to be in the trauma room in the first place. Defendant also contended that he did not consent to the seizure of his clothes. The court denied the motion.

¶ 34    The court sentenced defendant to 29 years' imprisonment for first degree murder, 8 years for aggravated discharge of a firearm, 6 years for conspiracy to commit aggravated discharge of a firearm, and 3 years for each perjury conviction. The aggravated discharge of a firearm sentence was to be served consecutively to the murder sentence, and the sentences for perjury and conspiracy were to run concurrently to the other sentences. Defendant moved to reconsider his sentences. The court reduced the first degree murder sentence to 25 years and his aggravated discharge sentence to 5 years.

¶ 35    Defendant appealed, and the Appellate Court, Fifth District, affirmed in part and vacated in part. 2022 IL App (5th) 190329. The court affirmed the trial court's denial of the motion to suppress. *Id.* ¶ 71. However, the appellate court agreed with defendant on two other issues. The court vacated defendant's conviction and sentence for conspiracy to commit aggravated discharge of a firearm, under the rule that a person may not be convicted of both the inchoate and principal offense (see 720 ILCS 5/8-5 (West 2016)). 2022 IL App (5th) 190329, ¶¶ 73-74. The court further agreed with defendant that one of his perjury convictions must be vacated under the one-act, one-crime rule. *Id.* ¶¶ 76-81. These latter two issues are not at issue in this appeal.

¶ 36    Addressing the motion to suppress, the court noted that defendant was making a different argument than he did in the motion. *Id.* ¶ 37. Defendant was no longer arguing that the clothes were not in plain view or that he did not provide consent for the detectives to seize the clothes. *Id.* Rather, he focused on the argument that he had made for the first time in his motion for a new trial—that he had a reasonable expectation of privacy in the trauma room and therefore the police were not entitled to enter the room without a warrant. *Id.* The court explained that defendant had forfeited this issue by raising it for the first time in his motion for a new trial. *Id.* ¶ 38. However, as the State did not argue forfeiture either at the hearing on the motion for a new trial or on appeal, the court elected to address the issue. *Id.*

¶ 37    The court explained that six factors are considered in determining whether a defendant had a legitimate expectation of privacy in light of the totality of the

circumstances. See *id.* ¶ 42 (citing *People v. Johnson*, 114 Ill. 2d 170, 191-92 (1986)). The court found that one of these factors weighed in defendant's favor but the other five weighed in the State's favor. *Id.* ¶¶ 57-63.

¶ 38    The court also discussed several cases with similar facts. The court explained that *People v. Hillsman*, 362 Ill. App. 3d 623 (2005), and *People v. Torres*, 144 Ill. App. 3d 187 (1986), held that there is no reasonable expectation of privacy in hospital emergency rooms, while *People v. Gill*, 2018 IL App (3d) 150594, held that there was a reasonable expectation of privacy in a private, single-occupancy patient room on the seventh floor of a hospital. 2022 IL App (5th) 190329, ¶¶ 44-46. The court viewed the present case as an "intersect of these cases" (*id.* ¶ 47) because defendant was in a single occupancy room with four walls and a door but he was also in the hospital's emergency department.

¶ 39    The court noted that the Second District had addressed a situation with similar facts in *People v. Pearson*, 2021 IL App (2d) 190833. 2022 IL App (5th) 190329, ¶ 48. Like this case, *Pearson* involved a defendant who presented to the emergency room with gunshot wounds to his legs. *Pearson*, 2021 IL App (2d) 190833, ¶ 5. He was not suspected of committing a crime when an officer entered the room where he was being treated and questioned him about how he had been shot. *Id.* ¶¶ 4, 6. The room was in the hospital's emergency department but had four walls, a single bed, and a door that was kept closed except for ingress and egress of hospital personnel. *Id.* ¶ 13. Knowing that the defendant's jeans were likely evidence of a crime, the officer inspected them. *Id.* ¶ 7. He found a bag containing a controlled substance in the pocket, and this led to the defendant's conviction of possession of a controlled substance. *Id.* ¶¶ 1, 7. The trial court found that the defendant did not have a reasonable expectation of privacy in the trauma room. *Id.* ¶ 11. However, the court initially granted the motion to suppress because it concluded that the defendant had a reasonable expectation of privacy in the clothing. *Id.* The State then moved for reconsideration, and the court granted the motion and reversed its previous ruling. *Id.* ¶ 12. The Second District reversed the denial of the motion to suppress. *Id.* ¶ 55. The court held that the relevant factors weighed in favor of finding that the defendant had a reasonable expectation of privacy in the trauma room. *Id.* ¶¶ 36-38. Because the defendant was in a private room, the court viewed the situation as more analogous to *Gill* than to *Torres* and *Hillsman*. *Id.* ¶ 39.

¶ 40    In the present case, the Fifth District reached a different conclusion than *Pearson*, although it noted that *Pearson* was distinguishable in that the door of the trauma room in *Pearson* had been closed, and the defendant's room was behind a locked door, thus precluding entry of the public. 2022 IL App (5th) 190329, ¶ 64. Here, defendant did not introduce evidence establishing either of those things. *Id.* However, the court would go on to suggest that the Second District had placed too much emphasis on the physical characteristics of the room rather than the use of the room or the reasons that the defendant was in the room. *Id.* ¶ 65.

¶ 41    Finally, the court noted that several federal and out-of-state cases supported its conclusion. *Id.* ¶ 71 (citing *United States v. Mattox*, 27 F.4th 668 (8th Cir. 2022), *Commonwealth v. Welch*, 167 N.E.3d 1201 (Mass. 2021), *State v. Lomax*, 852 N.W.2d 502 (Iowa Ct. App. 2014), *State v. Cromb*, 185 P.3d 1120 (Or. Ct. App. 2008), *State v. Rheaume*, 2005 VT 106, 179 Vt. 39, 889 A.2d 711 (Vt. 2005), *State v. Thompson*, 585 N.W.2d 905 (Wis. Ct. App. 1998), *Wagner v. Hedrick*, 383 S.E.2d 286 (W. Va. 1989), and *Buchanan v. State*, 432 So. 2d 147 (Fla. Dist. Ct. App. 1983)).

¶ 42    We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2021).

¶ 43                                        ANALYSIS

¶ 44    Defendant argues that the trial court erred in denying his motion to suppress because he had a reasonable expectation of privacy in the trauma room in the hospital's emergency department. Accordingly, defendant contends that the police were required to obtain a warrant before entering the room. Defendant has abandoned his arguments that (1) he did not consent to the detectives taking his clothes and (2) the clothes were not in plain view.

¶ 45    On a motion to suppress, "[a] defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure." *People v. Gipson*, 203 Ill. 2d 298, 306-07 (2003). If "the defendant makes out a *prima facie* case that a seizure was unreasonable, the burden shifts to the State to come forward with evidence to rebut." *People v. Bass*, 2021 IL 125434, ¶ 21. The ultimate burden of proof, however, remains with the defendant. *Gipson*, 203 Ill. 2d at 307.

¶ 46    In reviewing a circuit court's ruling on a motion to suppress, this court applies the two-part standard of review announced by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Lindsey*, 2020 IL 124289, ¶ 14. Under that standard, "the trial court's findings of historical fact are reviewed for clear error and may be rejected only if they are against the manifest weight of the evidence, but the trial court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*." *Bass*, 2021 IL 125434, ¶ 21.

¶ 47    Defendant grounded his motion in both the fourth amendment (U.S. Const., amend. IV) and the search and seizure clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 6).The fourth amendment to the United States Constitution provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

Article I, section 6, of the Illinois Constitution of 1970 provides:

> "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

We construe the search and seizure clause of our state constitution in "limited lockstep" with the fourth amendment. *People v. LeFlore*, 2015 IL 116799, ¶ 16.

¶ 48    The guarantees of the fourth amendment and the search and seizure clause of the Illinois Constitution "offer protection to people, not places (*People v. Smith*, 152 Ill. 2d 229, 244 (1992) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)), but the extent to which they protect people depends upon where the people are (*Minnesota v. Carter*, 525 U.S. 83, 88 (1998))." *Lindsey*, 2020 IL 124289, ¶ 16. Accordingly:

"Our analysis begins and ends *** with the question of whether the defendant has established a legitimate expectation of privacy in the place searched. *People v. Johnson*, 237 Ill. 2d 81, 90 (2010). In doing so, the defendant must point to a source outside the constitution—namely, formal property interests or informal privacy interests. *United States v. Jones*, 565 U.S. 400, 408, (2012); *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) ('Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.').

Those two types of sources roughly correspond to two complementary and overlapping tracks of fourth amendment jurisprudence: a property-based approach, exemplified by the United States Supreme Court's opinion in *Florida v. Jardines*, 569 U.S. 1 (2013), and a privacy-based approach, exemplified by Justice Kagan's concurrence in that case and Justice Harlan's concurrence in *Katz*. The government violates the fourth amendment either by a warrantless intrusion onto a person's property (see *id.* at 5) or by a warrantless infringement of a person's societally recognized privacy (see *id.* at 12 (Kagan, J., concurring, joined by Ginsburg and Sotomayor, JJ.) (citing *Katz*, 389 U.S. at 360 (Harlan, J., concurring)))." *Id.* ¶¶ 16-17.

Here, defendant had no property interest in the trauma room, and his argument is therefore based solely on the privacy-based approach.

¶ 49    Whether a defendant has a reasonable expectation of privacy in the area searched or the items seized is resolved in view of the totality of the circumstances of the particular case. *Johnson*, 114 Ill. 2d at 192. In determining whether a person has a reasonable expectation of privacy in a place searched, we consider the following factors: (1) ownership of the property searched, (2) whether the defendant was legitimately present in the area searched, (3) whether defendant has a possessory interest in the area or property seized, (4) prior use of the area searched or property seized, (5) the ability to control or exclude others from the use of the property, and (6) whether the defendant himself had a subjective expectation of privacy in the property. *People v. Pitman*, 211 Ill. 2d 502, 520-21 (2004); *Johnson*, 114 Ill. 2d at 191-92. It is the defendant's burden to establish that he had a legitimate

expectation of privacy in the searched property. *People v. Johnson*, 237 Ill. 2d 81, 90 (2010).

¶ 50    As the appellate court noted, previous appellate court decisions have determined that there is no reasonable expectation of privacy in a hospital emergency room. See *Hillsman*, 362 Ill. App. 3d 623; *Torres*, 144 Ill. App. 3d 187. Neither decision, however, contains any information about the physical characteristics of the emergency room, such as whether the defendant was in a separate room or a curtained-off area. Both decisions simply refer to the defendants as being in the emergency room when officers spoke to them.

¶ 51    By contrast, the court in *Gill*, 2018 IL App (3d) 150594, ¶ 93, determined that a defendant in a private room on the seventh floor of a hospital did have a reasonable expectation of privacy. The *Gill* court distinguished *Torres* and *Hillsman* on their facts, as those cases involved emergency rooms. *Id.* ¶ 92. The court explained that emergency rooms are designed for temporary, rather than extended, stays and that patients cannot restrict access to the emergency room. *Id.* The court was careful to reiterate, however, that whether a defendant has a reasonable expectation of privacy depends on the totality of the circumstances and those circumstances will vary from person to person and from case to case. *Id.* ¶ 96. Thus, the court emphasized that its holding should not be read as applying to all persons in private hospital rooms and that *Torres* and *Hillsman* should not be read as applying to all persons in emergency rooms. *Id.*

¶ 52    Finally, the court in *Pearson* considered a case similar to this one in that a person who reported to the emergency room as a gunshot victim was being treated in a single occupancy trauma room in the emergency department when the police questioned him. *Pearson*, 2021 IL App (2d) 190833. The court viewed the case as similar to *Gill* and held that the defendant had a reasonable expectation of privacy in the trauma room. *Id.* ¶¶ 39, 41. However, as the appellate court noted below, the record in *Pearson* showed that the door of the defendant's trauma room had been closed when the police entered, and the emergency department was separated from the waiting area by locked doors. 2022 IL App (5th) 190329, ¶¶ 49, 64.

¶ 53    Our focus here must be on the totality of the circumstances in the specific case before us. Moreover, we note that defendant put himself in a difficult position by raising the reasonable expectation of privacy issue for the first time in his posttrial

motion. In his motion to suppress, defendant did not challenge the detectives' initial entry into his room. Rather, he argued that the clothes were not in plain view and that he did not provide consent for their seizure. Accordingly, the testimony he presented was relevant to these contentions. Defendant's evidence was not geared toward establishing that he had a reasonable expectation of privacy in the trauma room.

¶ 54    Three of the six factors this court uses in determining whether a defendant demonstrated a reasonable expectation of privacy are not subject to dispute. The first and third factors clearly weigh against defendant's position. Defendant had neither an ownership nor a possessory interest in the trauma room. By contrast, defendant has established the second factor, as he was legitimately present in the trauma room. Thus, we turn to the remaining three factors.

¶ 55    The fourth factor is prior use of the property. Defendant argues that the appellate court has analyzed this factor by considering how long a person has been in a particular location. See, *e.g.*, *id.* ¶ 57 (defendant "was in the room about 15 minutes before officers arrived"); *Pearson*, 2021 IL App (2d) 190833, ¶ 36 (fourth factor "does not have a clear-cut application, as the record does not establish exactly how long Pearson had been in the room before Misiaszek entered"); *Gill*, 2018 IL App (3d) 150594, ¶ 85 ("[i]t is unclear how long defendant was in the room, with possibilities ranging from 8 hours to 15 minutes"). Defendant argues that analyzing the fourth factor with this this approach does not make practical sense because police may not know how long a person has been in a room and thus would not know whether they needed a warrant. Moreover, police may have to decide when defendant has been in a room sufficiently long that a warrant is required. Would the cutoff be 30 minutes? An hour? The police would have to guess. And hospital staff may not remember precisely how long a person has been in a trauma room. Accordingly, defendant argues that the court should instead analyze this factor by considering the unique nature of a trauma room. Defendant urges this court to hold that "patients in hospital rooms with four walls and a door are to be afforded the same expectation of privacy as overnight guests or hotel room occupants, with that expectation of privacy attaching as soon as the patient is placed in his individual room." Defendant relates this to the fourth factor by contending that this court's focus should be on prior use by *society at large*, which, according to defendant, would dictate a reasonable expectation of privacy.

¶ 56    We agree with defendant that analyzing the prior use factor by considering how long a person has been in a particular space is problematic. Again, the factor is *prior* use of the area searched or property seized. Whether a person is treated in the trauma room for 15 minutes or 4 hours, this is all the *same* use of the room. This court's cases demonstrate that the fourth factor refers to a *previous* use of the property. In *Johnson*, 237 Ill. 2d 81, this court considered whether the defendant had a reasonable expectation of privacy in a vehicle belonging to another person. In evaluating the fourth factor, this court said that "defendant failed to provide any evidence that he had *previously used the vehicle*." (Emphasis added.) *Id.* at 90; see *Johnson*, 114 Ill. 2d at 192 (in considering whether the defendant had a reasonable expectation of privacy in his stepfather's pickup truck, this court stated that "[t]he fact that defendant had driven the truck six months prior to its seizure is insufficient in view of the lack of any other evidence of a reasonable privacy expectation").

¶ 57    That said, we disagree with defendant that we should analyze this factor by considering how society at large uses a trauma room. As we explained above, we consider whether a defendant has a reasonable expectation of privacy by considering the totality of the circumstances of the particular case. This is a fact-specific inquiry. *Lindsey*, 2020 IL 124289, ¶ 40. As *Gill* observed, "[t]hese circumstances will vary from person to person and case to case, and it is well[ ]settled that the fourth amendment protects people, not places." *Gill*, 2018 IL App (3d) 150594, ¶ 96 (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). Thus, it is a *defendant's* prior use of the property that is the relevant consideration. However, unlike with cases involving vehicles, prior use is not a helpful factor in considering whether a defendant had a reasonable expectation of privacy in an emergency department trauma room. Whether this was the first time defendant had been treated in the emergency room or he had received treatment on several other occasions, his expectation of privacy would not change. It is simply the case that not all of the factors are relevant to every situation. We do not consider prior use of the trauma room a relevant or helpful factor in determining whether defendant had a reasonable expectation of privacy.

¶ 58    The fifth factor is the ability to control or exclude others from the use of the property. Defendant argues that the appellate court improperly considered only defendant's ability to include others but not his ability to exclude others from the trauma room. Defendant points out that *Gill* held that the defendant "likely

maintained some ability to exclude others from the room" (*id.* ¶ 85) and that *Pearson* stated that a hospital patient's implicit consent to the intrusion of medical personnel does not mean that he or she has waived the right to deny entry to the police and others (*Pearson*, 2021 IL App (2d) 190833, ¶ 29). Defendant asks this court to hold that defendant had the right to exclude others from his individual trauma room and that this right is comparable to a hotel occupant's right to exclude others from his room. We decline to do so.

¶ 59        First, we disagree with defendant's assertion that the appellate court did not consider defendant's ability to exclude others from the room. The appellate court stated, "[w]ith respect to the fifth factor—ability to control others' access to the area—*there is also no evidence to conclude defendant could exclude persons from the area*." (Emphasis added.) 2022 IL App (5th) 190329, ¶ 58. The appellate court was correct. It was defendant's burden to establish this factor, and he simply did not introduce any evidence on it. As we noted above, defendant put himself in a difficult situation by not raising the reasonable expectation of privacy issue until his motion for a new trial. Accordingly, defense counsel failed to ask Womick any questions about a patient's right to exclude others from the trauma room. We will not speculate about what ability to exclude others defendant "likely" had (see *Gill*, 2018 IL App (3d) 150594, ¶ 85) because it is defendant's burden to establish this factor.

¶ 60        The only evidence about exclusion from the trauma room came from the testimony of defendant's mother, Patrice Turner. Patrice testified that, when she arrived at the hospital to see her son, she was told that she would have to wait in the waiting room. She was not allowed to go to her son's room for at least an hour. This evidence established the hospital's control over access to the room. Defendant does not point to any evidence in the record establishing his right to exclude others from the trauma room, and the record showed that people were moving freely in and out of the room during the time he was being treated.

¶ 61        We also disagree with defendant's suggestion that a patient being treated in a trauma room should be considered to have the same rights of exclusion as a hotel guest. A person staying in a hotel is in a vastly different position from a gunshot victim being treated in the emergency room. Womick testified that the hospital is required to notify the police when a gunshot victim comes to the hospital. Womick

- 18 -

was referring to section 3.2(1) of the Criminal Identification Act (20 ILCS 2630/3.2(1) (West 2016)), which provides:

"It is the duty of any person conducting or operating a medical facility, or any physician or nurse as soon as treatment permits to notify the local law enforcement agency of that jurisdiction upon the application for treatment of a person who is not accompanied by a law enforcement officer, when it reasonably appears that the person requesting treatment has received:

(1) any injury resulting from the discharge of a firearm[.]"

¶ 62 The Eighth Circuit recently relied on the existence of a similar statute to reject an argument that a person being treated in a trauma room has the same reasonable expectation of privacy as a hotel occupant. See *Mattox*, 27 F.4th at 674. The facts in *Mattox* were remarkably similar to the case before us. Police officers responded to a 911 call about gunshots being fired at an apartment complex. *Id.* at 672. When they arrived on the scene, they learned that a man had been shot and taken to the hospital. *Id.* An officer went to the emergency room at the hospital and entered the room where the defendant was being treated. *Id.* at 673. The officer took the defendant's bloody clothes, which were on the floor of the room. *Id.* The defendant was eventually charged with possessing a firearm as a convicted felon, and he moved to suppress the evidence seized from his hospital room. *Id.* The trial court denied the motion. On appeal, the defendant argued that the police violated his fourth amendment rights when they entered the hospital room in which he was being treated. *Id.* at 673-74. He compared his situation to an overnight guest in a home or a hotel room occupant. *Id.* at 674. The Eighth Circuit rejected this argument, holding that the defendant did not have an objectively reasonable expectation of privacy in the hospital room:

"[O]vernight guests in homes and hotel rooms have a reasonable expectation of privacy. *Minnesota v. Olson*, 495 U.S. 91, 96-97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *United States v. Conner*, 127 F.3d 663, 666 (8th Cir. 1997). But that is because hosting overnight guests in homes 'is a longstanding social custom that serves functions recognized as valuable by society.' *Olson*, 495 U.S. at 98, 110 S.Ct. 1684. Being admitted to the hospital for a gunshot wound does not serve the same valuable societal function. In fact, police in Minnesota are expected to show up to hospitals to investigate a gunshot-wound victim like

Mattox because Minnesota law requires hospitals to report gunshot wounds to the police. *See* Minn. Stat. § 626.52, subd. 2; *United States v. Clancy*, 979 F.3d 1135, 1138 (6th Cir. 2020). The officer who interviewed Mattox testified that he had gone to the hospital in the past to interview victims of gunshot wounds. Accordingly, the Fourth Circuit has recognized that a police officer 'lawfully fulfilling his duty to investigate a reported shooting ... lawfully entered the emergency room of a hospital to interview the victim of the shooting.' *United States v. Davis*, 690 F.3d 226, 234 n.13 (4th Cir. 2012). Furthermore, unlike in hotel rooms and residential guest rooms, in a hospital room, people are constantly coming and going from the room to provide medical services. *Cf. Rakas v. Illinois*, 439 U.S. 128, 148-49, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (relying on the fact that the defendants could not exclude others from certain parts of a car in finding no legitimate expectation of privacy). And although Mattox rightly observes that there is a significant privacy interest in medical care, this interest is diminished in Minnesota for patients with gunshot wounds because the law requires the reporting of gunshot wounds. *See* Minn. Stat. § 626.52, subd. 2." *Id.*

See *Hillsman*, 362 Ill. App. 3d at 633 (obvious consequence of statute requiring reporting of injuries that may have been caused by criminal conduct is that police will begin their investigation at the medical facility); *Torres*, 144 Ill. App. 3d at 191 (same).

¶ 63    We agree with the Eighth Circuit that a gunshot victim being treated in an emergency department trauma room is in a significantly different situation than a guest in a hotel room. The situations are not comparable, and we thus disagree with defendant that he should be considered to have a comparable right of exclusion as occupants of hotel rooms. Rather, it was defendant's burden to establish that he had the right to control the use of the room and to exclude others, and he introduced no evidence establishing either of these things.

¶ 64    The final factor is whether defendant had a subjective expectation of privacy in the property. The appellate court explained that defendant failed to introduce any evidence establishing this factor:

"We further find no evidence of the sixth factor, defendant's subjective expectation of privacy. There is no indication that defendant wanted the trauma

room door closed or that defendant requested to have no visitors. By all accounts, defendant voluntarily spoke to and cooperated with the officers. The record does not reveal defendant took any steps to proclaim his privacy beyond his presence in the trauma room." 2022 IL App (5th) 190329, ¶ 59.

Defendant contends that this was error. According to defendant, this court held in *Pitman*, 211 Ill. 2d at 522, that all a defendant has to do to establish that he had a subjective expectation of privacy in the property is to "outwardly behave as a typical occupant of the space in which the defendant claims an interest, avoiding anything that might publicly undermine his or her expectation of privacy." Thus, according to defendant, because he occupied the trauma room as a patient receiving treatment for a gunshot wound and did not do anything to undermine his expectation of privacy, he demonstrated that he had a subjective expectation of privacy. We disagree

¶ 65    First, this cannot be the test for determining whether someone has demonstrated a subjective expectation of privacy. It does not follow that someone has demonstrated a subjective expectation of privacy in a space simply by acting as a typical occupant of that space. As the State points out, someone could not demonstrate a subjective expectation of privacy in a public park by acting as a typical occupant of a public park.

¶ 66    Second, defendant's position is based on a misreading of *Pitman*. This court never said in *Pitman* that a subjective expectation of privacy is established by acting as a typical occupant of a space. The issue in *Pitman* was whether the defendant had established that he had a reasonable expectation of privacy in a barn that his mother owned but that defendant worked in and used to store illegal drugs. This court cited the six factors, but ultimately did not address all of them. This court stated:

> "Although defendant did not own the farm, and specifically the barn, defendant clearly had a possessory interest in the entire farm and had the ability to control or exclude others from the use of the property. The record shows that Mary Pitman conferred on defendant the legal authority to take care of the farm." *Id.* at 521.

The court quoted *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978), for the proposition that " 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [the] right to exclude.' " *Pitman*, 211 Ill. 2d at 521-22. This court later reiterated that, "through authority granted by his mother, defendant had the right to be in the barn, to possess it, and to exclude others from it. *These rights are sufficient to establish defendant's reasonable expectation of privacy in the barn* ***." (Emphasis added.) *Id.* at 522. This court never specifically addressed whether the defendant had a subjective expectation of privacy, as several other factors were sufficient to establish that he had a reasonable expectation of privacy.

¶ 67       In the passage relied on by defendant, the majority was responding to an argument raised by the dissent. The majority noted that the dissent had focused on " 'whether or not the owners and possessors of farm and business structures took sufficient steps to impede access to those structures.' " *Id.* (quoting *id.* at 535 (Thomas, J., dissenting)). The majority contended that this was not necessary:

> "[D]efendant need not have taken affirmative steps to proclaim his expectation of privacy. The fact that the public could have discovered the plants by trespassing on the farm fails to legitimize an otherwise invalid search. The fact that parts of the barn's interior were visible did not mean that defendant threw open the interior of the barn to general public scrutiny. See *Wilson v. Health & Hospital Corp. of Marion County*, 620 F.2d 1201, 1212 (7th Cir. 1980). A defendant simply must outwardly behave as a typical occupant of the space in which the defendant claims an interest, avoiding anything that might publicly undermine his or her expectation of privacy. *Vega*, 221 F.3d at 797." *Id.*

¶ 68       Thus, the quoted passage of *Pitman* merely stands for the proposition that one who has a legitimate possessory interest in a space and the right to exclude others from it need not take additional steps to proclaim his expectation of privacy. This court took the language about behaving "as a typical occupant of the space" from *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000). *Vega* makes clear that this language is not the test for determining whether someone has demonstrated a subjective expectation of privacy. In *Vega*, the Fifth Circuit relied on a slightly different list of factors than this court uses to determine a reasonable expectation of privacy. *Vega* listed the factors as

- 22 -

" 'whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, *whether he has exhibited a subjective expectation of privacy* that it would remain free from governmental intrusion, *whether he took normal precautions to maintain privacy* and whether he was legitimately on the premises.' " (Emphases added.) *Id.* at 795-96 (quoting *United States v. Ibarra*, 948 F.2d 903, 906 (5th Cir. 1991)).

When the court used the language about acting as a typical occupant of the space, it was *not* addressing the subjective expectation of privacy factor. Rather, it was addressing the "normal precautions to maintain privacy" factor. The court was considering whether the defendant, who as a lessee of a house had a possessory interest and the right to exclude others, took normal precautions to maintain privacy. The court rejected the government's arguments about what precautions it would have been normal for the defendant to take (see *id.* at 796-97) and then stated that the government's arguments "demonstrate a fundamental misunderstanding of the requirement that one take 'normal precautions to maintain privacy.' That simply means that a defendant must outwardly behave as a typical occupant of the space in which he claims an interest, avoiding anything that might publicly undermine his expectation of privacy" (*id.* at 797). Thus, *Vega*, like *Pitman*, used this language not in discussing whether someone had demonstrated a subjective expectation of privacy, but in addressing whether a person with a legitimate possessory interest in property and the right to exclude others needed to take further steps to proclaim his expectation of privacy. Here, defendant did not have a possessory interest in the property.

¶ 69   Subsequent authority of this court further demonstrates that someone does not demonstrate a subjective expectation of privacy simply by acting as a typical occupant of a space. In *Lindsey*, this court considered whether the defendant had a reasonable expectation of privacy in the alcove outside his motel room. This court determined that there was no evidence that the defendant had a subjective expectation of privacy in the alcove. *Lindsey*, 2020 IL 124289, ¶ 42. In discussing this factor, this court noted that the defendant "presumably used the alcove for ingress and egress" (*id.* ¶ 41), so the court was willing to assume that the defendant was using the space as a person typically would. But the court still went on to hold

that there was no evidence that the defendant had a subjective expectation of privacy in the alcove. *Id.* ¶ 42.

¶ 70 In considering whether a patient in a trauma room has demonstrated a subjective expectation of privacy, other courts have considered similar factors as the appellate court did here. For instance, in *Rheaume*, 2005 VT 106, the issue was whether the defendant had demonstrated that he had a reasonable expectation of privacy in a trauma room in the emergency room. In determining whether the defendant had a subjective expectation of privacy, the Supreme Court of Vermont stated the following:

"Here, defendant has not demonstrated that he had a subjective expectation that no law enforcement officer would enter the emergency room without his consent. When Trooper Smith arrived at the emergency department, the door to defendant's trauma room was open. Once the officer entered the trauma room, defendant did not ask him to leave or suggest the room was private or inaccessible in any way. Defendant did not attempt to leave or limit contact with the officer. Moreover, defendant made the incriminating statements voluntarily—indeed, he blurted them out without having been questioned by the officer. There is no evidence that defendant manifested any subjective expectation of privacy in the treatment room." *Id.* ¶ 9.

¶ 71 We agree with the appellate court that defendant failed to introduce any evidence establishing that he had a subjective expectation of privacy in the trauma room. Rather, the evidence showed that he voluntarily spoke to the detectives when they entered the room. Womick and Etherton both testified that defendant was cooperative with the detectives. There is no evidence that he had asked for the door to be closed, requested to have no visitors, or asked the detectives to leave. It was defendant's burden to introduce evidence establishing that he had a subjective expectation of privacy, and he failed to do so.

¶ 72 In sum, defendant has failed to demonstrate that he had a reasonable expectation of privacy in the trauma room where he was triaged. Although defendant was legitimately present in the trauma room, none of the other factors weigh in his favor. He concedes that he had no ownership or possessory interest in the trauma room, and we have determined that he failed to submit evidence establishing the other factors.

¶ 73       While we again caution that each case must be decided on the totality of the circumstances of the particular case, we note that a number of state and federal courts have reached the same conclusion when considering similar cases. See *Mattox*, 27 F.4th at 674 (no objectively reasonable expectation of privacy in trauma room in hospital emergency room); *United States v. Franklin*, 64 F. Supp. 2d 435, 439 (E.D. Penn. 1999) (no reasonable expectation of privacy in hospital emergency room); *Welch*, 167 N.E.3d at 1211 (no reasonable expectation of privacy in room in hospital intensive care unit; as with an emergency room, several officers freely entered the room unhindered, and a steady stream of hospital personnel moved freely through the room; it is difficult if not impossible for a patient to control access in this situation); *Lomax*, 852 N.W.2d at 507 (no reasonable expectation of privacy in hospital emergency room); *Cromb*, 185 P.3d at 1126 (no reasonable expectation of privacy in curtained-off area of hospital emergency room; patient undergoing treatment in emergency room has no right to control "whether other patients, their families, or hospital personnel and other emergency workers, including police officers, may be present in the area"); *Hillsman*, 362 Ill. App. 3d at 633 (no reasonable expectation of privacy in emergency room; presence of police officers in emergency room is an obvious consequence of Illinois statute requiring medical personnel to inform authorities of people seeking treatment when their injuries may have been caused by criminal conduct); *Rheaume*, 2005 VT 106, ¶ 10 (no reasonable expectation of privacy in trauma room in hospital emergency department; "medical personnel, hospital staff, patients and their families, and emergency workers—including police officers—are, as a matter of course, frequently, and not unexpectedly, moving through the area"); *Matthews v. Commonwealth*, 517 S.E.2d 263, 264 (Va. Ct. App. 1999) (no reasonable expectation of privacy in treatment room in hospital emergency ward; room had four walls and a door, which was open; the defendant's contention that the room was separate from the emergency room was without evidentiary support); *Thompson*, 585 N.W.2d at 911 (no reasonable expectation of privacy in hospital emergency room; historical notions of privacy not offended when police officer responding to emergency call enters emergency room treatment area with acquiescence of hospital staff); *Wagner*, 383 S.E.2d at 291 (no reasonable expectation of privacy in hospital emergency room; medical personnel were moving freely about, and the area was freely accessible to law enforcement officers who had a right to be there because of their duty to investigate); *Torres*, 144 Ill.

App. 3d at 191 (same as *Hillsman*); *Buchanan*, 432 So. 2d at 148 (no reasonable expectation of privacy in curtained-off area of hospital emergency room; medical personnel were constantly walking in and out, and defendant could have expected to remain there only a few hours at most); *Craft v. Commonwealth*, 269 S.E.2d 797, 799-800 (Va. 1980) (person admitted to emergency room has little expectation of privacy; emergency rooms are frequented by medical personnel, patients, friends and relatives of patients, and police officers; police did not to go hospital to search the defendant or to seize his belongings but rather to investigate an attempted robbery in which it had been reported that the robber was shot).

¶ 74                                            CONCLUSION

¶ 75        Defendant did not meet his burden of establishing that he had a reasonable expectation of privacy in the trauma room in the hospital's emergency department. Accordingly, the trial court correctly denied defendant's motion to suppress. We therefore affirm the appellate court's judgment, which affirmed the denial of the motion to suppress.

¶ 76        Judgments affirmed.