THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. REGINALD SHANKLIN, Defendant-Appellant.

Fifth District   No. 5—92—0085

Opinion filed September 16, 1993.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MAAG delivered the opinion of the court:

After a jury trial, the defendant, Reginald Shanklin, was convicted in the circuit court of St. Clair County of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1)) and was sentenced to 20 years' imprisonment.

The issues raised on appeal are whether:

(1) the trial court erred in refusing to suppress the in-court identification of defendant by the 12-year-old victim where the in-court identification was based upon a suggestive lineup;

(2) the trial court erred in denying defendant's motion to suppress evidence seized during an illegal search of defendant's home; and

(3) the trial court erred in allowing the jury to hear inadmissible hearsay, thus denying defendant a fair trial.

The 12-year-old victim, E.W., testified that on the evening of April 11, 1991, she followed her 15-year-old sister, R.W., and R.W.'s friend, Tomika. The older girls were walking to Tomika's home. The defendant was standing in front of Daisy's Flower Shop and engaged E.W. in conversation. Defendant asked E.W. if R.W. was her sister and whether E.W. would give R.W. his telephone number. When E.W. answered in the affirmative to both questions, the defendant went into a neighboring gray and white house with a blue roof and returned with a piece of paper.

The defendant, at E.W.'s request, placed the paper on the ground and walked away. E.W. picked up the paper, and as the defendant rushed toward her, she attempted to flee by running into the street. E.W. testified that the defendant grabbed her by the back of the neck, slapped her because she struggled, and forced her into the gray and white house near Daisy's Flower Shop.

E.W. noticed that the house lacked a screen or storm door over the brown front door. The first room she entered contained a couch,

and the second room had no furnishings except two large red pillows, carpeting, and a sheet over the window. The third room contained some blankets and miscellaneous items but no furniture.

E.W. testified that the defendant obtained a blanket, rope, and a roll of gray tape from the contents of the third room. He spread the blanket on the floor in the room with the red pillows and instructed E.W. to be seated on it. He placed the gray tape over her mouth. He ordered E.W. to remove her clothing, and he removed his own. The defendant then penetrated her vagina with his penis.

During the assault someone knocked on the front door. The defendant stopped, got up, and got dressed. He told E.W. to dress, and after looking out the front door, he pushed E.W. out of the house. E.W. ran all the way home and reported the assault to her mother. The mother immediately contacted the East St. Louis police and took the child to the hospital. Before E.W. was taken to the hospital, R.W. questioned her sister regarding the identity of her attacker and the location of the assault.

R.W. testified that she had not known that E.W. was following her. R.W. related that on the day before the assault she had talked to a boy at Daisy's Flower Shop and that boy had asked her her name and where she lived. She had told the boy her name but refused to tell him where she lived. She observed the boy enter a gray and white house with a brown door two doors from Daisy's on the same side of the street.

R.W. testified that E.W., before being transported to the hospital, described her assailant as being dark and tall and sporting a high-low haircut. E.W. also told R.W. that the assault had occurred near Daisy's Flower Shop. R.W. immediately thought of the boy who had approached her the day before. She directed the police to a gray and white house at 1336 Market where she had observed the boy she spoke with the day before the assault. The police officers knocked on the door at 1336 Market and asked the defendant to walk out onto the porch. R.W. identified the defendant as the same person that had approached her the day before.

Detective James Mister testified that on April 11 he and Inspector Lester Anderson were directed by R.W. to 1336 Market. Detective Mister testified that after R.W. identified the defendant as being the boy she spoke with the day before, and observing that the defendant matched the description E.W. had given of her assailant, the detective radioed the police station and asked E.W. to describe the house where she was assaulted. Detective Mister testified that the detectives could see from the porch that the furnishings of the gray and white house

located at 1336 Market matched E.W.'s description of the location of the assault. Detective Mister testified that from the porch he could see red pillows against a back wall of the bedroom. E.W. described her assailant as having a "high-low haircut" and having been dressed in a hooded sweatshirt and sweatpants which, according to Detective Mister's testimony, was the style of defendant's hair and the type of clothes the defendant was wearing.

The defendant was placed under arrest and handcuffed. The police officers entered the house, and once inside, they saw a yellow blanket in another room. They searched the house, but could not find any additional items. A crime scene technician arrived and checked the pillows and blanket into evidence. No one else was present in the house. The defendant did not give the detectives permission to look around, but neither did he object. He did not sign a consent to search his home. At trial the crime scene technician identified the red pillows and yellow blanket as the items he took from defendant's home. They had not been examined by a forensic scientist. He also stated that he did not think that the pillows could be seen from the front porch of the home, although he was uncertain.

At the time of defendant's arrest, Detective Sandy Muckenstrum was interviewing E.W. Detective Muckenstrum testified that subsequent to the interview, she placed E.W. in her automobile and asked the child to direct her to the place where she was assaulted. E.W. directed Detective Muckenstrum to 1336 Market. Detective Muckenstrum located defendant's wife, and with her permission together they entered and searched 1336 Market on April 13. Detective Muckenstrum recovered a ball of rope or twine from the residence. Mrs. Shanklin testified at defendant's trial that the red pillows could not be seen from the front porch.

After defendant's arrest, he was transported to the East St. Louis jail. The following day, defendant was placed in a lineup with five other guests of the jail. E.W. viewed the lineup and identified defendant as her assailant.

On August 5, 1991, defendant filed motions to suppress the physical evidence seized from his home and the lineup identification. At the suppression hearing held on September 6, 1991, Detective Muckenstrum testified that the defendant was the only lineup participant with a high-low haircut, wearing a hooded sweatshirt and sweatpants. The motion to suppress the lineup identification of defendant was granted, but defendant's motion to suppress the physical evidence seized from defendant's home was denied.

On September 4, 1991, the State filed a motion for admission of hearsay evidence of the commission of a sexual act on a child under the age of 13, pursuant to statute (Ill. Rev. Stat. 1991, ch. 38, par. 115—10). The trial court ordered a hearing to determine the circumstances under which E.W.'s statements were made. The hearing was held on September 9, and the trial court limited E.W.'s mother's testimony.

The defendant did not take the stand. The jury heard medical and forensic evidence that semen was found in E.W.'s vagina and that defendant by virtue of his blood type could have contributed the seminal material.

The defendant argues that he was denied a fair trial because the trial court erred in allowing the victim to identify the defendant at trial subsequent to a suggestive lineup at which the victim identified the defendant as her assailant. The State responds that the defendant failed to raise this issue in his post-trial motion and, therefore, the issue is waived. The State relies upon our supreme court's decision of *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1131, which holds that to preserve alleged errors, the errors must be both objected to at trial and raised in a post-trial motion.

■■ In his reply brief, defendant raises for the first time the issue of the plain error rule's application (134 Ill. 2d R. 615(a)). In *People v. Szabo* (1986), 113 Ill. 2d 83, 94, 497 N.E.2d 995, 999, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 181, 107 S. Ct. 1330, the supreme court described the plain error rule as a narrow and limited exception to the general waiver rule. The purpose of the plain error rule is to correct serious errors of such magnitude that the accused was denied a fair trial. (*People v. Sommerville* (1990), 193 Ill. App. 3d 161, 171, 549 N.E.2d 1315, 1323.) The doctrine is applied in criminal cases only if the evidence is closely balanced or the alleged error is so serious that it deprives a defendant of a fair trial. (*Sommerville*, 193 Ill. App. 3d at 171, 549 N.E.2d at 1323.) Unfortunately, defendant failed to raise the argument of the plain error rule's application until his reply brief, in violation of Supreme Court Rule 341(e)(7), which provides that "[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." (134 Ill. 2d R. 341(e)(7).) Supreme Court Rule 341 is made applicable to criminal appeals by Supreme Court Rule 612. 134 Ill. 2d R. 612.

Even if we were to reach the merits, we note that defendant's position is groundless. Our independent examination of the record reveals neither a close balance of the evidence nor any obvious prejudice that would merit departure from the general waiver rule (134 Ill. 2d

R. 341(e)(7)). See *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

In *People v. McTush* (1980), 81 Ill. 2d 513, 518, 410 N.E.2d 861, 865, the supreme court held that where a lineup has been found to be impermissibly suggestive, a witness may still be permitted to make an in-court identification where it is established clearly and convincingly from the totality of the circumstances that the witness is making the identification based upon memory of the crime. The court enumerated factors to be considered which include: the witness' opportunity to view the perpetrator at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the perpetrator; the level of certainty demonstrated by the witness at the confrontation; the length of the time between the crime and the confrontation; and any acquaintance with the suspect prior to the crime. *McTush*, 81 Ill. 2d at 521, 410 N.E.2d at 865.

■ The record reveals that the State established clearly and convincingly an independent origin for E.W.'s in-court identification of defendant as her assailant. At trial, E.W. testified as to her recollection of the events before, during, and after the sexual assault. E.W. extensively testified as to her opportunity to view and observe the assailant while they spoke on the sidewalk, after he forced her into the house, and during the sexual assault. With respect to the witness' degree of attention, the record reflects that E.W. gave extensive descriptions of the house and the furnishings of the house where the sexual assault took place. E.W. further gave a consistent description of the assailant to her mother, sister, and police and at trial. From the record it does not appear that E.W. was uncertain of her in-court identification of the defendant as her assailant. Lastly, the trial took place five months after the sexual assault. Accordingly, we believe that the trial court did not err in denying defendant's motion to suppress E.W.'s in-court identification of the defendant.

Defendant also alleges that the trial court erred in denying his motion to suppress the physical evidence, consisting of a yellow blanket and two red pillows, which were seized from his home without a warrant. The State admits in its brief that the record does not reveal any exigent circumstances requiring the police officers to enter defendant's home without a warrant. The State argues that the "inevitable discovery exception" to the exclusionary rule as recognized in *Nix v. Williams* (1984), 467 U.S. 431, 444, 81 L. Ed. 2d 377, 387, 104 S. Ct. 2501, 2509, is controlling.

■ The inevitable discovery exception to the exclusionary rule provides that where the record shows by a preponderance of the evi-

dence that the challenged information or evidence would have been ultimately or inevitably discovered by lawful means, the evidence is admissible. (*Nix v. Williams* (1984), 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501.) For the inevitable discovery doctrine to apply, three criteria must be met: (1) the condition of the evidence must be the same when found illegally as it would have been when found legally; (2) the evidence would have been found by an independent line of investigation untainted by the illegal conduct; and (3) the independent line of investigation must have already begun when the evidence was discovered illegally. *People v. Winsett* (1991), 222 Ill. App. 3d 58, 69, 583 N.E.2d 589, 596, *rev'd on other grounds* (1992), 153 Ill. 2d 335, 606 N.E.2d 1186.

The defendant contends that the inevitable discovery exception is inapplicable because the third factor as outlined above is absent. Defendant argues that no independent "legitimate search" had begun at the time the red pillows and yellow blanket were seized by the police, and therefore, the physical evidence should have been suppressed. We note that an independent "legitimate search" is not required, and it is apparent from the record that an independent line of investigation, as required, had begun at the time the police officers seized the red pillows and yellow blanket.

■ E.W. was being interviewed by Detective Muckenstrum at the time the other officers arrested defendant and seized the physical evidence from defendant's home. Subsequent to the interview, Detective Muckenstrum placed the child in her automobile and asked the child to direct her to the house where she was assaulted. Detective Muckenstrum testified that E.W. directed her to 1336 Market. Detective Muckenstrum located defendant's wife, and on April 13, 1991, with defendant's wife's permission, together they searched the residence at 1336 Market. Neither the defendant's wife nor the defendant, who was in custody, was living at the residence during the intervening time. If the officers had not seized the yellow blanket and red pillows at the time of defendant's arrest, they would have been discovered at the time of Detective Muckenstrum's subsequent legal search. The trial court did not err in refusing to suppress the red pillows and yellow blanket.

Ignoring for a moment the inevitable discovery doctrine, we believe that even if it was error not to suppress the physical evidence seized, that error was harmless. No forensic testing was performed upon the items, and thus only the pillows and blanket themselves were introduced into evidence. Detective Mister testified that he observed the red pillows from the front porch. From that lawful vantage

point, Detective Mister could and did testify that red pillows were observed in defendant's home. The pillows' actual introduction into evidence could not in our belief have significantly contributed to defendant's conviction.

The yellow blanket is more troublesome as it was not observed by the police from a vantage point outside the home. Given E.W.'s inability to relate the color of the blanket on which the assault took place, as well as the fact no forensic tests took place on the yellow blanket introduced, and further, that E.W. was not asked to identify the yellow blanket, we believe that the introduction of the yellow blanket was also, at worst, harmless error. As defense counsel brought out during the trial, the yellow blanket was admittedly taken from defendant's home. Yet that was the only fact established regarding the yellow blanket.

Lastly, defendant contends that he was denied a fair trial because R.W. was allowed to testify as to the description E.W. gave of her attacker and further was allowed to testify to the alleged conclusion that defendant was the assailant. Defendant argues first that the statements were inadmissible as hearsay and prior consistent statements and, second, that R.W.'s conclusion that defendant was the assailant intruded upon the ultimate issue of fact presented to the jury, namely, whether defendant was the assailant.

■ While it is true that "[h]earsay evidence is an out-of-court statement offered to prove the truth of the matter asserted[ ] and is generally inadmissible unless it falls within an exception" (*People v. Lawler* (1991), 142 Ill. 2d 548, 557, 568 N.E.2d 895, 899), such an exception is present in the case before us. In his brief, the defendant fails to recognize or address the statutory exception allowing the admission of hearsay evidence of the commission of sexual acts on children under 13 years of age. (Ill. Rev. Stat. 1991, ch. 38, par. 115—10.) The statute provides:

> "(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, *** the following evidence shall be admitted as an exception to the hearsay rule:
> ***
> (2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child." (Ill. Rev. Stat. 1991, ch. 38, par. 115—10.)

Prior to trial, the State made a motion for admission of hearsay evidence pursuant to this statutory exception. After the required hear-

ing, the trial court granted the motion; the court only limited the content of E.W.'s mother's testimony.

Defendant argues that R.W.'s testimony regarding the description E.W. gave of her assailant does not fall within the statutory exception because it was not an identification, but rather a mere description, and the description was general in nature. " 'Clearly, an identification of the perpetrator of an "act" is a "detail pertaining" to that act.' " (*People v. Priola* (1990), 203 Ill. App. 3d 401, 418, 561 N.E.2d 82, 95, quoting *People v. Morton* (1989), 188 Ill. App. 3d 95, 103, 543 N.E.2d 1366, 1371.) We see little distinction between an "identification" by a child victim and a "description" by a child victim. A description, like an identification of the perpetrator of an act, is a detail pertaining to that act. To hold otherwise would defeat the purpose of the statute and allow testimony in only those cases where the children are familiar with their assailant and able to identify the assailant.

■ Finally, the defendant contends that admitting R.W.'s conclusion that the defendant was the assailant intruded upon the jury's role as fact finder. We disagree. Contrary to defendant's assertions, the record does not reflect that R.W. decided, based upon E.W.'s description of the assailant and the location of the attack, that she knew E.W.'s assailant. Rather, the record reflects that R.W. led the police to the boy she had observed the day before who matched E.W.'s description and was observed in the vicinity of the location of the attack. We believe that R.W.'s testimony did not intrude upon the jury's duty to determine if defendant was the assailant.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

CHAPMAN, P.J., and LEWIS, J., concur.