2026 IL App (2d) 250295-U
No. 2-25-0295
Order filed April 28, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant,<br><br>v. DARREN L. ALDRIDGE, Defendant-Appellee. | Appeal from the Circuit Court of Lake County.<br>Honorable David C. Lombardo, Judge, Presiding.<br>No. 24-CF-2594 |

JUSTICE MULLEN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court did not err in granting defendant's motion to suppress gun recovered after protective sweep of basement had been completed: (1) defendant had standing to contest search of basement of apartment he lived in; (2) search of basement was not justified by exigent circumstances; (3) hot-pursuit doctrine was not applicable; (4) where defendant was arrested outside of house, search of basement was not a valid search incident to arrest; (5) inevitable-discovery doctrine did not apply where no independent investigation would have led to recovery of gun; and (6) where State did not identify precedent police relied on in expanding search beyond protective sweep, good-faith exception did not apply.

¶ 2                                    I. INTRODUCTION

¶ 3    The State appeals an order of the trial court granting a motion to suppress evidence made

by defendant, Darren L. Aldridge. For the reasons that follow, we affirm.

¶ 4                                    II. BACKGROUND

¶ 5    Defendant was arrested and charged with aggravated discharge of a firearm, unlawful possession of a weapon by a felon, and two counts of aggravated unlawful possession of a firearm. The charges arose out of an incident on December 21, 2024, where the police responded to a reported shooting. On arrival, a witness identified defendant as the shooter. Defendant fled on foot. Police pursued him to his house (losing sight of him during the chase) and, after a short time, prepared to enter the house through a basement door that was not locked. Meanwhile, defendant exited the front door of his house and was taken into custody. The police then entered the basement and conducted a protective sweep. After determining no one was in the basement, they searched the basement and found a pistol located on top of a box above the furnace. Defendant filed a motion to suppress, arguing that that warrantless search of the basement was illegal. The trial court agreed and suppressed the pistol. The following evidence was presented at the hearing on defendant's motion.

¶ 6    Defendant first called Latanya Rucker, defendant's aunt. She and defendant resided at 1411 Grand Avenue, apartment one, in Waukegan. Rucker rents the apartment from her landlord. She pays $1,150 in rent, and defendant pays Rucker $250. On the day defendant was arrested, Rucker was away. The building was a two-flat, with an apartment on the second floor that was occupied by other tenants. Her apartment consisted of two bedrooms, a living room, a dining room, a kitchen, a bathroom, an enclosed front porch, and a basement. None of these rooms are locked. She could access the basement from her apartment, but the upstairs tenants could not. There is an exterior entrance to the second-floor apartment. There is a door between the apartments, but it is "blocked off." The only entrance to the upstairs apartment is from the outside. The second-floor tenants did not have access to the basement. Only Rucker and defendant had access to the basement. Rucker identified a check stub and a W-2 form belonging to defendant that was

- 2 -

addressed to their apartment. Defendant had lived at the apartment for six years and has a set of keys to the apartment.

¶ 7    On cross-examination, Rucker agreed that there was a stairwell between the main floor of her apartment and the basement. The upstairs tenants did not have access to this stairwell. Defendant kept his belongings in his bedroom. The basement was accessible from the outside. Rucker answered affirmatively when asked, "If that door was unlocked, some member of the public could walk in through that exterior basement door, correct?" She added, "[I]f it was unlocked." The basement contained various items that all belonged to Rucker.

¶ 8    On redirect-examination, Rucker explained that on the day defendant was arrested, she had been gone for two weeks. While she was gone, her brother was staying at her home. Her brother was "residing on the main floor." She added that this "included the common areas of the kitchen, living room, [and] the basement." On recross-examination, she testified that at the time of the arrest, her brother "was at the house sleeping," "heard the commotion in the basement," and "went toward the basement door." An "officer told him to go back upstairs and shut the door."

¶ 9    Defendant then presented a stipulation regarding how Officer Haske would testify, if called. Specifically, Haske would testify that:

"he, along with other officers from the Waukegan Police Department, responded to a call of shots fired at approximately 1830 on December 21, 2024. *** Waukegan Police Department officers learned from witnesses on scene that a man wearing red pants and a yellow, reflective vest had allegedly fired a gun in the direction of another individual at the intersection of Grand Avenue and Butrick Street in Waukegan, Illinois. *** [S]hortly thereafter, the same man that matched the suspect's description was spotted by other Waukegan police officers who chased him until they lost him at the rear of 1411 Grand

Avenue, Waukegan, Illinois. At 1858 and 30 seconds prior to entering the residence at 1411 Grand Avenue, Officer Haske learned that the suspect that matched the description of the alleged shooter was detained by other Waukegan Police Department officers in front of 1411 Grand Avenue. *** Officer Haske would testify that he entered the basement of 1411 Grand Avenue at 1859 and 27 seconds through a rear, unlocked door that was accessible from the outside, along with at least four other Waukegan Police Department officers without a search warrant. *** [H]e would testify that he and other officers began a search of the basement at 1901 and 17 seconds. And ***, finally, he would testify that he located a gun on a box on top of a furnace at 1903 and 7 seconds."

Defendant then rested. The State moved for a directed finding, and the trial court denied the State's motion.

¶ 10    The State first called Antonio Moreno, a police officer with the Waukegan Police Department. On December 21, 2024, at about 6:30 p.m., Moreno responded to the area of Grand Avenue and Butrick Street regarding a "shots-fired call." Officer Molina was already at the scene when Moreno arrived. He saw "two females arguing." He spoke to them. They told Moreno that "the subject fired a firearm towards a male subject, and they described a chrome 9-millimeter handgun." Moreno looked for a spent shell casing but did not find one. There was a lot of snow on the ground. One of the women told Moreno that the shooter lived next door at 1411 Grand Avenue, which is just west of the intersection of Grand Avenue and Butrick Street. As Moreno was looking for the spent shell casing, one of the women pointed out the shooter (defendant) to him near the intersection. Defendant was wearing a reflective vest and red pants. Moreno stated that he got a good look at defendant's face. Moreno told defendant to stop. Defendant started to walk away and then began to run. Moreno pursued him. Defendant ran behind a cinder-block wall, and Moreno

lost sight of him. Other officers on Grand Avenue in front of the house (1411 Grand Avenue) did not see defendant, and there were no footprints in the snow in back of the house, so Moreno assumed that defendant had entered the building (he further noted that he had been told that defendant lived there).

¶ 11    The police established a perimeter around the house and formed a "reaction team." A reaction team is a "quick little group" of "first-responding officers that have extra equipment including shields, rifles, [and] breaching tools." Moreno explained that they believed defendant was inside, that he might still be armed, and that there might be "innocent bystanders inside the building that could possibly be in harm's way." Moreno characterized this as an "imminent threat to the public," as defendant "was shooting a gun out in the open at someone already." Ten to twelve officers were present at this time.

¶ 12    Moreno watched the reaction team approach the back of the house. The team checked the entrance door on the main level and found that it was locked. They determined that the door to the basement was unlocked. From his vantage point, Moreno could see Sergeant Driscoll on the north-east side of the house. He observed defendant "trying to walk by Sergeant Driscoll." Moreno called out to Driscoll, and they apprehended defendant. Driscoll stated that defendant had come out of the front door of 1411 Grand Avenue. Moreno told defendant what the witnesses had "said he had done during the shooting incident." Defendant replied that "that they might have thought that I shot my gun." On cross-examination, Moreno explained that when defendant disappeared behind the cinder-block wall as Moreno was chasing him, Moreno ceased the pursuit, as he did not know if defendant was still armed and did not want to get ambushed.

¶ 13    The State then called Officer Anthony Molina, also of the Waukegan Police Department. Molina was on patrol near the intersection of Grand Avenue and Butrick Street at about 6:30 p.m.,

on December 21, 2024. He observed a crowd of people at the south side of the intersection. It "looked [like] there was some sort of dispute." Molina stopped to investigate. A woman "flagged [him] down and said someone had fired a firearm." As Molina was speaking to people at the scene, Moreno told him that someone was running away after Moreno had told him to stop. The individual was running toward the house at 1411 Grand Avenue. Molina moved to the west side of the residence, where the driveway met the street. The suspect never emerged from that side of the house. Other officers arrived, and they established a perimeter around the residence.

¶ 14    Molina and "a couple other officers" set up a reaction team. Prior to entering the house, they made several announcements identifying themselves. No one from inside responded. They were preparing to enter through a basement door, which was unlocked. Molina was to be the first to enter. When he opened the door, he observed what appeared to be an unfinished basement. He stated, "There was an interior stairwell that led up to *** the main level or the main living space." "Boxes and random objects" were "scattered" about. The area appeared to be used for storage. Molina characterized it as a "common area for the building." As they continued to announce their presence, "an unknown subject" called down the stairwell. The unknown voice stated that they "had who [they] were looking for essentially." Molina did not know (and never learned) the identity of the "unknown subject" or whether he was "a relative or a friend or even an accomplice of the defendant." He also did not know whether defendant or a live weapon in the basement posed a threat to this individual. At about this time, they were informed by Sergeant Driscoll and Moreno that the suspect had been taken into custody. They instructed the individual to stay upstairs. They then entered the basement. About six officers entered.

¶ 15    Molina agreed that when he was informed that the suspect had been apprehended, he was not told whether the pistol used in the shooting was recovered as well. As far as Molina knew, the

gun "might still have been in the basement." Upon entry, the reaction team conducted "a protective sweep of the basement." They determined that no one else was in the basement. During a protective sweep, the police are looking for suspects, victims, and evidence that were in plain view. Officer Haske—an evidence technician—located a gun "sitting on top of a box in the rafters above like an HVAC or furnace heating unit."

¶ 16    After they located the gun, they left the basement and went to the north side of the residence where defendant had been detained. The two women whom Molina initially had spoken with were present. They identified defendant as the shooter.

¶ 17    On cross-examination, Molina acknowledged that his report of the incident lists 1411 Grand Avenue as defendant's address. Molina did not know whether the person speaking from the stairwell was the suspect. He was made aware that someone had been detained that matched the subject's description about the time he encountered this individual. After this individual was instructed to stay upstairs, they conducted their protective sweep, after which, Molina testified, the basement was secure.

¶ 18    Officer Johnathon Haske next testified for the State. Haske is a police officer with the Waukegan Police Department. He had been trained as an evidence technician. He was called to 1411 Grand Avenue because "[o]fficers had reported that they were on scene for shots fired and a subject that had fled them on foot." A perimeter had been established by the time Haske arrived. He went to the south-east corner of the residence and waited for instructions. Haske entered the basement as part of the reaction team. They cleared the basement, finding no one in it. After they determined that no one was in the basement, Sergeant Baysinger instructed "the officers to continue searching the basement to look for weapons." Haske testified that he located a firearm:

"There was a furnace kind of near the entryway of, like, where the rear door that we entered in was. On top of the furnace there was a black—what appeared to be like a black metal lock box. When I grabbed that metal lock box and kind of moved it, a pistol slid forward on the box, and I placed my hand up there to kind of stop it from falling down."

Haske asked other officers to remain with the pistol, and he went to retrieve a camera so he could photograph it where it was "after the point where [he] stopped it." The gun was not visible to Haske when he first touched the box.

¶ 19    Haske testified that there was no indication that anyone was sleeping or living in the basement. There was a stairwell inside of the basement that led upstairs. He added, it "leads from the basement inside the house up to the main level of the house."

¶ 20    On cross-examination, Haske testified that "it was clear[] that there were no people in the basement [u]pon [the] initial sweep." As part of the search for weapons, Haske looked behind a mirror and then looked in a grill, a tall vase, a laundry basket, and a small cardboard box that appeared to hold Christmas lights. He then "moved another few boxes and looked in them." He then located the pistol on top of the box that was above the furnace.

¶ 21    The State next called Sergeant Stephen Driscoll. On December 21, 2024, at about 6:30 p.m., he responded to 1411 Grand Avenue in Waukegan regarding a call of shots fired. Driscoll positioned himself at the north side of the residence. An individual exited from the house. The individual "acted like [Driscoll] wasn't even standing there." Driscoll found this unusual as typically, in such situations, people will acknowledge the police's presence and ask about what was transpiring. The individual matched the description of the shooter. Driscoll took defendant into custody and searched him, but found no weapons. He relayed to other officers on the scene that he had detained a "possible subject" and that no weapon was recovered.

¶ 22    Sergeant Joseph Baysinger was the State's next witness. He responded to the incident at issue here. Other officers were already present. Baysinger was in charge of the officers on the south side of the house. They "formed a couple teams" and first checked "what [they] thought was a common area entrance." They were hoping to make contact with "any occupants inside and check on their safety and investigate further." He clarified that there were two entrances on the south side, one on the main floor and one to the basement. They first checked the entrance on the main floor and found that it was locked. They then checked the basement door and determined that it was unlocked. Molina opened the door and reported that it appeared to lead to a common area. After hearing an individual "yelling" from inside, Baysinger decided to pause the entry. At about this time, he was informed that an individual had been detained on the north side of the house who "was believed to be the offender." Baysinger stated, "So after I learned that it was highly likely that the offender was being detained at the front of the house, I decided to make entry into that common basement area." He explained why he decided to enter the basement:

> "Well, based on the nature of the crime, the close proximity to this residence from where the shooting occurred and the fact that the offender appeared to flee from officers, I wanted to go in and make sure that there was no victims, other victims that needed attention, that there was no outstanding, unknown offenders and that there was nothing hazardous in the immediate access."

Because the basement was unsecured, Baysinger was concerned about "anyone accessing the weapon."

¶ 23    Baysinger testified that the basement appeared to be "commonly shared." He added, "There was nothing to indicate it was someone's primary residence." They "swept from the south side to the north side of the basement looking for, at first, people, and then I gave direction to look for any

hazardous evidence that was immediately accessible." Baysinger explained that the "protective sweep" was conducted to look for "[a]nything [that was] in plain view or immediately accessible in the basement." The pistol that was recovered on top of the box on the furnace matched the description the witnesses gave of the gun. Baysinger stated that he was already discussing the next steps they would take with Lieutenant Buckingham when the gun was discovered, which would have been to make contact with the individual on the main floor and "get consent for a detailed search." The State asked what Baysinger would have done if they could not obtain consent; however, the trial court sustained a defense objection to this question.

¶ 24 On cross-examination, Baysinger agreed that he did not "know" the basement was a common area prior to looking through door. The building did appear to be a residence. The building appeared to have multiple apartments and the basement had a separate entrance. When asked whether the basement was open to the public, he replied that it was "unlocked so it would be open to anyone that opened the door."

¶ 25 On redirect-examination, Baysinger testified that he suspected there was a firearm in the basement. He explained the basis for his suspicion:

"Based on the information I had from the officers leading up to that point that I believe they were in a short pursuit of the offender and that no firearm was located in the vicinity. In addition to when the offender was detained out front and a firearm was not located on his person, there was—I believed that the firearm was most likely in the basement."

Baysinger agreed that he intended to keep the basement secured "until a thorough search for a firearm could be had."

¶ 26 The State then rested, and, after argument, the trial court issued its ruling. It first stated that the facts were not in controversy. The trial court noted that after defendant was first observed by

the police near the intersection of Grand Avenue and Butrick Street, it was "a very reasonable assumption that he went into the residence at 1411 *** Grand Avenue, Apartment 1." Prior to the police entering the basement, defendant was taken into custody in front of the house, and no weapon was recovered from his person. It found that defendant had a reasonable expectation of privacy in the basement, noting that "the defendant along with Ms. Rucker are tenants of the main floor and that includes the basement, that they both pay rent, and they both enjoy the privacy of the residence to the exclusion of anyone else." There was no evidence that the landlord occupied the basement or "allows all of the tenants to use the space." It found that "[a]n officer, to his credit, I found him to be credible, but his opinion as to whether it's a common area is irrelevant." In fact, the trial court added, it was not and belonged to the first-floor tenants.

¶ 27 The trial court further found that it was a legitimate concern that there might be a victim or co-offender in the basement. Thus, a protective sweep was warranted. However, once the sweep was completed, the police continued to search for a weapon, during which they looked "in all sorts of places that no human being could hide." The trial court found, "That is a search, and there is no basis for that search to be carried out under the facts of this case."

¶ 28 The trial court found that probable cause existed that "a weapon would be found in the building." However, the police "should have gotten a warrant after they secured the premises with the perimeter team and the react team after they cleared the basement." Accordingly, the trial court ordered the weapon recovered by the police suppressed. The State now appeals.

¶ 29                                    III. ANALYSIS

¶ 30 On appeal, the State raises six main issues. First, it contends that defendant lacked standing to contest the search of the basement. Second, the State argues that exigent circumstances justified the officers' search for the gun. Third, the State asserts that the search was warranted under the

- 11 -

hot-pursuit doctrine. Fourth, it maintains that search was properly conducted incident to defendant's arrest. Fifth, it argues that the gun should not be suppressed in accordance with the inevitable-discovery doctrine. Sixth, it posits that the officers were acting in good faith. We find none of these arguments well-taken.

¶ 31 On appeal, we apply a two-part standard of review to a trial court's ruling on a motion to suppress. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Findings of historical fact are reviewed for clear error, meaning that "we will reverse those findings only if they are against the manifest weight of the evidence." *Id*. A finding is contrary to the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *People v. Rozela*, 345 Ill. App. 3d 217, 222 (2003). However, "we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *Luedemann*, 222 Ill. 2d at 542. The State, as the appellant, bears the burden of establishing error in the proceedings below. *In re D.S.*, 2021 IL App (1st) 192257, ¶ 19; *Sherwood Commons Townhome Owners Ass'n, Inc. v. DuBois*, 2020 IL App (3d) 180561, ¶ 18.

¶ 32 A. Standing

¶ 33 The State first argues that defendant lacked standing to contest the search of the basement. Generally, a defendant has standing to contest a search only if he or she has a legitimate expectation of privacy in the area searched. *People v. Johnson*, 237 Ill. App. 3d 860, 864 (1992). "Whether one has a legitimate expectation of privacy in an area searched is measured by an objective standard drawn from common experience." *People v. Rosenberg*, 213 Ill. 2d 69, 78 (2004). Whether such an expectation exists is assessed with regard to "the totality of the circumstances of the particular case." *People v. Turner*, 2024 IL 129208, ¶ 49. Relevant factors include:

"(1) ownership of the property searched, (2) whether the defendant was legitimately present in the area searched, (3) whether defendant has a possessory interest in the area or property

seized, (4) prior use of the area searched or property seized, (5) the ability to control or exclude others from the use of the property, and (6) whether the defendant himself had a subjective expectation of privacy in the property." *Id*.

*Id.* ¶ 57. It is a defendant's burden to establish that he or she has standing. *Id.* ¶ 49.

¶ 34 We note the trial court made some factual findings that are relevant here, which are subject to deferential review. *Luedemann*, 222 Ill. 2d at 542. It found that "the defendant along with Ms. Rucker are tenants of the main floor and that includes the basement, that they both pay rent, and they both enjoy the privacy of the residence to the exclusion of anyone else." Moreover, there is no indication that the landlord occupied the basement or "allow[ed] all of the tenants to use the space." Finally, it expressly found that the basement belonged to the first-floor tenants. The State does not suggest that these findings are contrary to the manifest weight of the evidence (with one exception (see *infra* ¶ 36)); accordingly, we will accept them for the purpose of resolving this appeal.

¶ 35 Returning to the factors set forth above, the State first asserts that there was no evidence that defendant owned the property at issue here. *Turner*, 2024 IL 129208, ¶ 49. This is undoubtedly true; however, under the facts of this case, this consideration is entitled to little weight. See *Turner*, 2024 IL 129208, ¶ 57 (holding that "not all of the factors are relevant to every situation."). Quite simply, the evidence established that defendant resided in the first-floor apartment for six years. He paid rent and received mail there, and he stored his belongings in one of the bedrooms. According to Rucker, none of the interior rooms are locked. Courts have long recognized that tenants have a legitimate expectation of privacy in their homes. See *Stoner v. California*, 376 U.S. 483, 490 (1964) ("No less than a tenant of a house, or the occupant of a room in a boarding house, [citation] a guest in a hotel room is entitled to constitutional protection against unreasonable

- 13 -

searches and seizures."); see also *United States v. Whitaker*, 820 F.3d 849, 853 (7th Cir. 2016) ("Whitaker's lack of a reasonable expectation of complete privacy in the hallway does not also mean that he had no reasonable expectation of privacy against persons in the hallway snooping into his apartment using sensitive devices not available to the general public."); *People v. Carodine*, 374 Ill. App. 3d 16, 23 (2007) ("Although [the] defendant leased the apartment in which he and his mother resided, he had no possessory interest to the common area from which the officer reached because the inhabitants of two other units had access to the common area."). Indeed, standing has been conferred on overnight guests. *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) ("Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."). In short, defendant lived at 1411 Grand Avenue, which was more than adequate to establish his standing to contest the search.

¶ 36     The State counters that while Rucker testified that she and defendant had access to the basement from the main floor, her testimony was "clearly rebutted by the presence of an unknown individual, potentially [her] brother, who came down the basement stairs." How this clearly rebuts Rucker's testimony is not apparent to us, as the stairs originated from within the apartment and, inferably, the individual (Rucker's brother) was there with Rucker's knowledge and permission. The State also points to the fact that the basement had a door to the outside, but cites nothing to suggest that this somehow destroyed any expectation of privacy. In any event, neither of these facts render an opposite conclusion to the trial court's clearly apparent.

¶ 37     The second factor concerns "whether the defendant was legitimately present in the area searched." *Turner*, 2024 IL 129208, ¶ 49. The State concedes that this factor favors a finding that defendant has standing to contest the search of the basement. We agree with the State.

- 14 -

¶ 38    Turning to the third factor, "whether defendant has a possessory interest in the area or property seized" (*Turner*, 2024 IL 129208, ¶ 49), we hold that this factor strongly favors a finding that defendant has standing to contest the search in this case. In *People v. Pitman*, 211 Ill. 2d 502, 521 (2004), our supreme court equated a possessory interest with "legal authority" over the area searched. The United States Supreme Court has explained, "[O]ne who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12 (1978).  Rucker testified that she and defendant were tenants, that both paid rent, and that only she and defendant had access to the basement. Defendant's lawful possession and control of the basement were inferable from this testimony.

¶ 39    The fourth factor concerns a defendant's prior use of the area searched. *Turner*, 2024 IL 129208, ¶ 49. There was no direct evidence presented on this point. However, it is inferable that defendant was sufficiently familiar with the basement so as to be able to access it from a separate door that led to it rather than the main floor of the apartment, quickly find a hiding spot for a pistol, move upstairs using the interior stairwell, and exit through the front door of the apartment. It is well-established that circumstantial evidence may be considered as it bears upon a proposition at issue. See, *e.g.*, *People v. Bailey*, 333 Ill. App. 3d 888, 891-92 (2002). As such, this factor weighs somewhat in defendant's favor.

¶ 40    Fifth, we must consider "the ability to control or exclude others from the use of the property." *Turner*, 2024 IL 129208, ¶ 49. Defendant's status as a rent-paying tenant combined with his entitlement to access the basement indicates that he had such abilities. Indeed, the right to exclude others has been recognized by our supreme court as being entailed in status as an "owner-occupant, tenant, subtenant, or hotel guest." *People v. White*, 117 Ill. 2d 194, 211 (1987); see also

*Rakas*, 439 U.S. at 143 n. 12 ("One of the main rights attaching to property is the right to exclude others."). This factor weighs in defendant's favor as well.

¶ 41    Sixth, we are directed to assess "whether the defendant himself had a subjective expectation of privacy in the property." *Turner*, 2024 IL 129208, ¶ 49. Defendant did not testify, and there does not appear to be any other evidence of defendant's subjective expectations in the basement. As defendant had the burden of establishing his standing (*Turner*, 2024 IL 129208, ¶ 49), this factor favors the State.

¶ 42    Thus, four factors favor defendant to various degrees, one favors the State, and one has little pertinence to the present factual situation. Most importantly, the evidence indicates that the apartment at 1411 Grand Avenue shared by defendant and his aunt was his home for six years and (as the trial court found) the basement is part of that apartment. In short, defendant has standing to contest the police's entry into the basement.

¶ 43    Before leaving this issue, we note the State's reliance on *Carodine*, 374 Ill. App. 3d 16. That case involved a search of a dryer vent from the outside of a building. *Id.* at 18-19. It did not involve an entry by police into the building as occurred in this case. As such, it is wholly distinguishable. The State attempts to analogize *Carodine* to the instant case because the search in *Carodine* occurred "in a common area where other tenants of the building, the landlord, delivery persons, door-to-door salesmen, and other members of the public had access." *Id.* at 24. The State makes much of the fact that the basement door was unlocked and such people could therefore have accessed the basement. However, it cites nothing to support the proposition that, absent permission from Rucker or defendant, any such entry into their basement would have been anything but a trespass. The possibility of a trespass would not defeat defendant's expectation of privacy. See

*Pitman*, 211 Ill. 2d at 522 ("The fact that the public could have discovered the plants by trespassing on the farm fails to legitimize an otherwise invalid search.").

¶ 44                                    B. Exigent Circumstances

¶ 45    Next, the State contends that the search of the basement was justified by exigent circumstances. Generally, a warrantless search is *per se* unreasonable unless it falls within an exception to the warrant requirement. *People v. Harrell*, 226 Ill. App. 3d 866, 871 (1992). Thus, a defendant sets forth a *prima facie* case of an illegal search by showing that the search was conducted without a warrant. *People v. Cregan*, 2014 IL 113600, ¶ 26; *People v. Gipson*, 203 Ill. 2d 298, 307 (2003). It then becomes "the State's burden to show that the search falls into one of the well-defined exceptions." *People v. Rushing*, 272 Ill. App. 3d 387, 390 (1995). One such exception is when exigent circumstances exist. *Id.* at 872. The State asserts that an "immense risk to public safety, as well as the safety of potential occupants of 1411 Grand, and the safety of the officers still existed." The State notes that defendant had recently fired a gun at someone, fled into the building, and did not comply with commands to exit the building. The police did not know if anyone inside was injured or whether an accomplice was still an accomplice at large. Moreover, since no weapon was recovered when defendant was taken into custody, there was possibly a loaded gun left unsecured somewhere in the structure.

¶ 46    The State notes that the trial court found that the police were justified in conducting a protective sweep of the basement. As explained by the United States Supreme Court: "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Neither the State nor defendant contest this portion of the trial court's ruling. The

issue, then, is whether the police justifiably exceeded the scope of the sweep when they searched the basement for weapons. An additional factual finding of the trial court is that the police "cleared the basement, made it safe, protected it, the sanctity of it" and, having done so, the trial court concludes (the following is not a finding of fact), "they should have gotten a warrant to go in." The State does not argue that these factual findings are against the manifest weight of the evidence.

¶ 47 The State claims that exigent circumstances properly allowed the police to go beyond the limits of a protective sweep. Exigent circumstances are circumstances that make it impractical for the police to obtain a warrant. *People v. Nichols*, 2012 IL App (2d) 100028, ¶ 59. This requires probable cause. *Rushing*, 272 Ill. App. 3d at 391. This means that the officers had to have sufficient information to justify a reasonable belief of the existence of the relevant circumstances. See, *e.g.*, *People v. Ferral*, 397 Ill. App. 3d 697, 710 (2009) (finding entry justified by exigent circumstances where police officer "had reasonable grounds to believe that a burglary was in progress and that there was an immediate need for his assistance"). Before deciding whether circumstances justified the expansion of the protective sweep, we must first determine whether an exigency existed. *People v. Harrell*, 226 Ill. App. 3d 866, 877 (1992) ("Therefore, no exigency existed, and the seizure was in derogation of the defendant's fourth amendment rights."); see also *People v. Davis*, 398 Ill. App. 3d 940, 950 (2010).

¶ 48 At the time the police expanded the protective sweep into a search for a weapon, no exigency existed. The trial court found, following the protective sweep, the basement had been "cleared" and made "safe." As noted, defendant was in custody and a protective sweep had been conducted which revealed no other person in the basement. It was unknown but reasonable to believe that defendant might have hid a possibly loaded firearm somewhere in the basement. The State points to the potential danger presented by unknown accomplices and the individual the

police encountered and directed to return upstairs when they first prepared to make entry. However, the protective sweep dispelled the former concern, and it is unclear how searching the basement would have mitigated any risk that the individual upstairs in the apartment may have presented. Moreover, the individual was cooperative when directed to return upstairs and the police never attempted to contact him or ascertain his identity at any point during these events. After the protective sweep, there was no one that reasonably could have been feared to either use or be threatened by a firearm in the basement. Under such circumstances, courts have held that no exigency exists.

¶ 49    On this issue, *Rushing*, 272 Ill. App. 3d 391, provides sound guidance. In that case, the defendant and his brother (Austin) lived in separate apartments in a single apartment building. Austin called the police and told them that the defendant had threatened him with a gun. Police officers went to the door of the defendant's apartment, knocked, and were greeted by the defendant's mother. They asked where the defendant was, and the defendant's mother directed them to the bathroom. The defendant was patted down and the bathroom was searched, but no gun was found. A number of officers arrived and remained with the defendant, his mother, and his father in the living room. The officers "looked around the apartment for the gun," but did not find one. An officer went to Austin's apartment to ask where he could find the gun. Austin stated that the defendant was a drug dealer and kept his drugs in a tool box under his bed. He added that the gun might be there. The officers recovered the tool box, opened it, and found cocaine, heroin, and cash. Again, no gun was found. The police arrested the defendant and left the apartment.

¶ 50    The defendant moved to suppress, and the State argued that the officers' actions constituted a protective sweep and that exigent circumstances justified the search. It argued that the search was necessary to ensure officer safety, as one of the other occupants, perhaps angered that the

defendant was being arrested, constituted an "unknown peril." *Id.* at 390. After rejecting the assertion that search of the toolbox could be considered a protective sweep, the *Rushing* court addressed exigent circumstances. It noted that the sole justification proffered by the State was that the defendant's parents may have posed a threat. However, it found that no evidence justified that concern, as the defendant's parents had been "accommodating" to the police, even directing them to the bathroom where the defendant was hiding. *Id.* at 392. The court rejected the notion that the "loose gun" presented a threat, noting that the officers terminated the search after they found the contraband and did not continue to look for the gun. *Id*. Moreover, there was "no evidence *** that any other exigency existed." *Id*. at 393. Thus, given the parents presented no threat, the mere presence of the "loose gun" did not constitute an exigency.

¶ 51    The State attempts to distinguish *Rushing* noting that in *Rushing*, the court found that the defendant's parents were no threat to the police, while in this case, "the unknown location of the firearm along with the unknown presence of any accomplices inside the building, there was a high risk of danger to the police, as well as the public." We find the State's attempt unpersuasive for two reasons. First, in *Rushing*, the firearm was never found, so its location was also unknown. Second, after the protective sweep, the purported danger from unknown persons in the basement had been dispelled, as the trial court found.

¶ 52    Similar to *Rushing* where the defendant's parents were deemed to be no threat, in this case, once the protective sweep was completed, there was no one present that could have accessed the gun in the basement (per the trial court's factual findings that the basement was secured and safe). In fact, there was even less of a potential threat in this case because, while in *Rushing*, the defendant's parents were determined to not pose a threat, in this case, there was no one present that needed to be ruled out as a threat. The individual the police initially encountered (Rucker's

brother), like the parents in *Rushing*, was cooperative. There is no evidence that he posed a threat. All that remains is the possible presence of a "loose gun" which, as in *Rushing*, was not an exigency in itself.

¶ 53 Similarly, in *People v. Carter*, 2016 IL App (3d) 140958, the reviewing court considered, *inter alia*, whether exigent circumstances justified a search for a gun. In that case, the "defendant moved to quash the warrant and suppress the physical evidence, a gun, allegedly found after [a] search authorized by [a] search warrant had concluded." *Id.* ¶ 1. The police executed a search warrant at a duplex owned by the defendant. An individual who occupied a separate living space than the defendant in the same house was arrested during the search and informed the police of the presence of a gun hidden in the defendant's couch. Meanwhile, other officers concluded the search of the defendant's living space and left the duplex, but were still present in the defendant's yard. Based on the information obtained from the arrested individual, the police decided to re-enter the duplex, searched the couch, and found a gun.

¶ 54 The State conceded that the original search had terminated at the time the police re-entered the defendant's home. It argued that the gun should not be suppressed in accordance with the doctrine of inevitable discovery. The reviewing court considered whether the gun at issue would have been discovered by any "lawful means" (*Id.* ¶ 29 (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)), including whether the search was justified by exigent circumstances (*Id.* (citing *People v. Wimbley*, 314 Ill. App. 3d 24-25 (2000)). It concluded no exigent circumstance existed, explaining, "Though [the] defendant, a felon, was allegedly illegally in possession of a gun, there was no immediate threat of harm or injury to the officers or anyone else because of the possible presence of the gun in the house." *Id.* ¶ 32. It added, "Thus there were no exigent circumstances requiring the need for swift action or a justification for not seeking a new warrant." In the present case,

likewise, the police having conducted a protective sweep, any gun in the basement posed "no immediate threat of harm or injury to the officers or anyone else." *Id*. Hence, as in *Carter*, no exigent circumstance existed here.

¶ 55    Moreover, on the facts presented, the police simply could have secured the basement while they obtained a warrant. As the trial court found, the basement had already been secured. Nothing indicates that getting a warrant would have been impractical. *Nichols*, 2012 IL App (2d) 100028, ¶ 59 (holding exigent circumstances exist when obtaining a warrant would be impractical). Indeed, numerous cases have found that exigent circumstances did not exist where the police could have secured the area to be searched while they sought a warrant. See, *e.g.*, *People v. Martin*, 2017 IL App (1st) 143255, ¶ 35 ("Further, there were multiple officers at the scene who could have secured the premises while a warrant was obtained. Under these circumstances, we decline to find that exigent circumstances justified the warrantless entry."); *People v. Butler*, 2015 IL App (1st) 131870, ¶ 48 ("Here, there was no immediate and clear danger to the police or others [citations], and there was no reason Officer Shannon could not have waited and secured a warrant prior to searching defendant's cell phone."); *People v. Santovi*, 2014 IL App (3d) 130075, ¶ 40 ("Here, where the circumstances are that [the] defendant purposely excluded police from the bathroom of her home, and the record reveals that officers easily could have secured the premises and sought an arrest warrant, there is no justification to abandoning the warrant requirement."); *People v. Payton*, 317 Ill. App. 3d 909, 914 (2000) ("Furthermore, if consent had been denied, they could have secured the porch area to prevent any tampering with the grill while a warrant was obtained."); *People v. Brown*, 277 Ill. App. 3d 989, 991 (1996) ("In light of these circumstances, we see no reason why the officers could not have maintained the stakeout for the additional period

required to procure a warrant."). That the police could have secured the basement and procured a warrant forecloses the State's claim that exigent circumstances existed.

¶ 56    In short, we reject the State's argument that the expansion of the protective sweep to a search for a weapon was justified by exigent circumstances.

¶ 57                                C. Hot Pursuit

¶ 58    The State next argues that the hot-pursuit doctrine justified the expansion of the protective sweep to a search of the basement for weapons. Pursuant to this doctrine, "police also may enter a private residence without a warrant to effectuate the arrest of a fleeing suspect of whom the police are in 'hot pursuit.' " *People v. Davis*, 398 Ill. App. 3d 940, 951 (2010). Quite simply, "a suspect may not defeat an arrest which has been set in motion in a public place *** by the expedient of escaping to a private place." *United States v. Santana*, 427 U.S. 38, 43 (1976).

¶ 59    The applicability of the hot-pursuit doctrine to this case is unclear to us. As noted, the doctrine allows police to enter a residence to make an arrest. The arrest of defendant is not at issue here. Moreover, the entry into the basement was found proper by the trial court, and defendant does not contest that ruling. The State's argument is as unpersuasive as it is unclear.

¶ 60                          D. Search Incident to Arrest

¶ 61    The State next argues that "[t]he officer's recovery of the gun was justified as a search incident to arrest." Generally, when the police make a valid arrest of an individual, they may, incident to that arrest, search the area within that individual's "immediate control." *People v. Cregan*, 2014 IL 113600, ¶ 31. "Immediate control" means "the area where he might gain possession of a weapon or destructible evidence." *Id*. "The search of the area of the arrest *** must be justified by the possibility that the arrestee might gain possession of a weapon or destroy

- 23 -

evidence"; therefore, "[t]he scope of an area search is *** limited to the area within the arrestee's immediate control." *Id.* ¶ 29.

¶ 62    We initially note that the propriety of the arrest of defendant is not at issue, nor is the initial entry into the basement. Hence, the pertinent issue here is whether the area the gun was discovered in was within defendant's "immediate control" at the time of his arrest. Defendant was arrested outside, in front of the residence; the gun was discovered inside on top of a furnace. Quite obviously, the gun was not within an area under defendant's immediate control at the time he was arrested. Without citation to authority, the State asserts: "The fact that defendant was arrested outside the house does not mean that the basement area was not still within defendant's immediate control."

¶ 63    It does, however, cite *People v. Tillman*, 355 Ill. App. 3d 194 (2005), in support of its position. In that case, the defendant was charged with possession of a controlled substance with intent to deliver, and he moved to suppress evidence recovered at the time he was arrested. The police pursued two individuals who they had probable cause to believe committed a felony into the defendant's apartment. While inside the living room of the apartment, they observed defendant and noted he had something in his hand. The defendant walked quickly into his bedroom. An officer followed and saw the defendant put the item in his hand into a hole in a wall. The officer placed the defendant in custody and kicked a hole in the wall about a foot below the hole that the defendant placed the object in. The officer recovered narcotics and a handgun from the wall.

¶ 64    The trial court granted the defendant's motion to suppress, but the reviewing court reversed. *Id.* at 195. The reviewing court first noted that the officers were lawfully inside the defendant's apartment pursuant to the hot-pursuit doctrine. *Id.* at 198. Further, the defendant's reaction to the officers—attempting to hide something in the wall—provided probable cause to conclude that the

item in the defendant's hand was contraband. *Id.* at 199-200. The seizure of the contraband from the wall was done as a valid search incident to arrest. *Id.* at 200. The reviewing court determined that the contraband was recovered from an area within the defendant's immediate control. *Id*.

¶ 65    On the pertinent issue of whether the basement was an area within defendant's immediate control when he was arrested outside of the residence, *Tillman* offers no meaningful guidance. Unlike defendant here, the defendant in *Tillman* was arrested in the same room from which the contraband was recovered. Indeed, the State offers no authority whatsoever that would allow the police to search an area defendant had vacated pursuant to an arrest occurring elsewhere. Accordingly, the State has forfeited this issue. *Alms v. Peoria County Election Comm'n*, 2022 IL App (4th) 220976, ¶ 28 ("Reviewing courts are not depositories where litigants may dump the burden of argument and research; courts are entitled to have the issues clearly defined and a cohesive legal argument presented."). As such, it has not carried its burden on appeal of demonstrating error in the trial court's decision.

¶ 66                                E. Inevitable Discovery

¶ 67    The inevitable discovery doctrine allows for the admission of evidence that would otherwise be suppressed "where the record shows by a preponderance of the evidence that the challenged information or evidence would have been ultimately or inevitably discovered by lawful means." *People v. Shanklin*, 250 Ill. App. 3d 689, 695-96 (1993). The inevitable discovery doctrine applies where the following three criteria are met:

> "(1) the condition of the evidence must be the same when found illegally as it would have been when found legally; (2) the evidence would have been found by an independent line of investigation untainted by the illegal conduct; and (3) the independent line of

investigation must have already begun when the evidence was discovered illegally." *Id.* at 696.

The first factor is not at issue, since the police likely would have secured the basement while seeking to obtain a warrant had they proceeded with that course of action.

¶ 68    Regarding the existence of an independent line of investigation, the State offers the following:

"[T]he gun would have been found by an independent line of investigation untainted by the purportedly illegal conduct. As the trial court noted, good police work occurred here. Officers responded extremely quickly to the report of shots fired. Eyewitnesses told police that defendant shot at someone during a verbal dispute and pointed him out to the police. Defendant fled from police into 1411 Grand Avenue. Police quickly established a perimeter and a reaction team to ensure the safety of those inside. Defendant was arrested a short time later after he exited 1411 Grand and tried to walk past the police."

Essentially, the State is arguing that other officers at the scene, who were acting in concert with the officers who conducted the search in responding to the call of shots fired, had probable cause from which they could have obtained a warrant to search the basement. The State cites no case finding the existence of an independent line of investigation on even vaguely similar facts.

¶ 69    The State cites *People v. Baker*, 2020 IL App (2d) 180300, however, that case is distinguishable. In *Baker*, a police officer observed a man matching the description of a person that had just robbed a drug store. The officer attempted to stop the man, but the man tried to walk away. The officer threatened to release a dog, and the man stopped. During the detention (which was deemed to be a *Terry* stop), the officer found cigarettes and money in the defendant's pocket, The defendant sought to suppress the cigarettes and money, arguing the search exceeded the

- 26 -

permissible scope of a search pursuant to a *Terry* stop. The State argued—and the trial court agreed—that these items would have been inevitably discovered.

¶ 70    The reviewing court affirmed, finding that "there is no question that the police had already begun investigating the robbery when the allegedly illegal search was conducted." *Id.* ¶ 21. It noted that a surveillance video at the drug store was sufficient to provide probable cause that the defendant was the perpetrator of the robbery. *Id.* ¶ 22. Hence, the items at issue would have been discovered during a search incident to the arrest of the defendant.

¶ 71    Conversely, in this case, the police officer that arrested defendant was part of a perimeter formed to contain defendant if he should flee the residence when the reaction team conducted its entry. There was no separate investigation that had been started at the time of the illegal search. See *People v. Nesbitt*, 405 Ill. App. 3d 823, 834-35 (2010) ("Here,  ***, there was no testimony that an independent investigation was in progress, or that a subpoena or search warrant had been requested, but that the investigation was stopped because the subject consented to the search."). The mere fact that these officers had probable cause and could have gotten a warrant had they sought one is insufficient to justify expanding their search beyond a protective sweep. See *Carter*, 2016 IL App (3d) 140958, ¶ 33 ("The State's actual assertion that discovery of the gun was inevitable because the police were capable of acquiring a second warrant is not persuasive and also flies in the face of the purpose of obtaining a warrant."); see also *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971) ("This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' "). In sum, the State's reliance on the inevitable discovery doctrine is misplaced.

¶ 72                                   F. Good Faith

¶ 73    The State next argues that the gun should not have been suppressed in accordance with the good-faith exception. The good-faith exception provides, generally, that where a police officer has acted in good faith, the fruits of an otherwise illegal search need not be suppressed. *People v. LeFlore*, 2015 IL 116799, ¶ 24. Thus, where a police officer acts based on a facially valid warrant, suppression is typically not appropriate, though the warrant be later determined to be invalid. *People v. Terrell*, 2025 IL App (3d) 240567, ¶ 43. Similarly, where the police act in reliance on appellate precedent that is later reversed, exclusion is not warranted. *People v. Bonilla*, 2018 IL 122484, ¶ 37. Reliance on a statute that is later declared unconstitutional also constitutes good faith. 725 ILCS 5/114-12(b)(2) (West 2024). These three recognized bases are not the *sine qua non* of good faith, and, in their absence, a court must consider "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *LeFlore*, 2015 IL 116799, ¶ 25 (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)). The inquiry is objective and does not focus on the subjective intention of the officers involved. *LeFlore*, 2015 IL 116799, ¶ 25.

¶ 74    No warrant was issued in this case, and the State identifies no case or statute that would legitimize the officers' conduct. We must still consider whether a reasonably well-trained officer would have known that expanding the search beyond a protective sweep was illegal under the circumstances. The State asserts that the police were confronted with "a dangerous, rapidly unfolding situation with a lot of unknowns." It contends that at the time they expanded the protective sweep into a search for a firearm, "the safety of the public, and the officers, was of paramount concern." It reasons, "The conduct at issue here, searching for a firearm to ensure the safety of the public, the officers, and occupants of the apartment complex, is not the sort of unlawful police conduct that needs to be deterred." The State misses the point of the good-faith

exception; it does not apply simply because police officers' motivations were pure of heart. Rather, it focuses on " 'whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.' " *LeFlore*, 2015 IL 116799, ¶ 25 (quoting *Leon*, 468 U.S. at 922 n.23).

¶ 75    Regarding this pertinent question, as defendant points out, beyond the fact that the State has offered no case law that would colorably justify the officers' conduct that was later overturned, existing precedent indicates that expansion of the protective sweep was not warranted. Defendant points out that *Maryland v. Buie*, 494 U.S. 325, 327 (1990), limits a "protective sweep" to "a cursory visual inspection of those places in which a person might be hiding." The State identifies no case that would allow for the expansion of the sweep beyond these parameters that a reasonably well-trained police officer might have relied on in concluding the search was permissible. As such, the good-faith exception has no applicability here.

¶ 76                                    IV. CONCLUSION

¶ 77    For the reasons stated, we affirm the judgment of the circuit court of Lake County and remand for further proceedings.

¶ 78    Affirmed.